NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0164n.06

No. 15-5314

FILED
Mar 23, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

SCOTTIE DALE PENNINGTON,                    )
                                            )
    Plaintiff-Appellant,                    )
                                            )
v.                                          )    ON APPEAL FROM THE
                                            )    UNITED STATES DISTRICT
BOB TERRY; DAVID DUKES; KEN SIRCY;          )    COURT FOR THE MIDDLE
BRIAN LONG; JAMES HARRIS; CHRIS LYNN,       )    DISTRICT OF TENNESSEE
                                            )
    Defendants-Appellees.                   )
                                            )


BEFORE:    SUHRHEINRICH and MOORE, Circuit Judges; LUDINGTON, District Judge.[*]

    SUHRHEINRICH, Circuit Judge.

    Plaintiff-Appellant Scottie Pennington ("Pennington") appeals the district court's decision granting summary judgment to Defendant-Appellees Sergeant James Harris ("Sergeant Harris") and Officer Brian Long ("Officer Long") (collectively "Defendants") in his § 1983 action alleging excessive force. On March 2, 2012, Sergeant Harris made a routine traffic stop of a vehicle in which Pennington was a passenger. During the traffic stop, the officers attempted to prevent Pennington from swallowing drugs in an apparent effort to destroy evidence. Although the incident was recorded by the dashboard camera mounted on Officer Long's vehicle, the parties dispute whether Sergeant Harris discharged his Taser against Pennington's torso in the course of the struggle. The district court ruled that even if Sergeant Harris did

---

[*] The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

deploy his Taser, using a Taser to prevent Pennington's destruction of evidence and potential drug overdose was objectively reasonable and did not violate the Constitution. We affirm, but for different reasons.

## I.    BACKGROUND

### A.  Facts

On the evening of March 2, 2012, Sergeant Harris pulled over Robert Caudill ("Caudill") for driving with a revoked license. Pennington was a passenger in Caudill's truck. Officer Chris Lynn ("Officer Lynn")[1] and Officer Long arrived soon after Sergeant Harris made the stop. Officer Lynn stood by the driver's side of the truck, while Officer Long stood next to the passenger side, where Pennington was sitting.

Officer Long's dashboard camera recorded most of the ensuing events. R.29. The parties stipulated that this video accurately shows Pennington's arrest. Although the audio from the video recording is not always distinct, the visual image clearly depicts all of the material facts. Moreover, the video is the only evidence on which Pennington relies to support his version of the facts. Appellant Reply Br. 4-8. Therefore, unless otherwise specified, we relate the following facts as gleaned from the video recording.

According to his affidavit, Officer Long noticed that Pennington appeared to be "trying to hide something" and asked Pennington to step outside the truck. R.29, at 2:08. Pennington voluntarily exited the vehicle. *Id.* at 2:10-2:15. Shortly after stepping outside the truck, Pennington turned away from Officer Long, bent over, coughed, and transferred something from his right hand to his mouth. *Id.* at 2:15-2:19. Observing Pennington's behavior, Sergeant Harris rushed over and grabbed Pennington's right arm and neck, attempting to prevent Pennington

---

[1] Officer Lynn was a defendant in the district court case, along with Police Chief Bob Terry, Police Major David Dukes, and Police Sergeant Ken Sircy. These officers were not personally involved in arresting Pennington, and Pennington does not challenge summary judgment to these defendants on appeal. Appellant Br. 8.

from swallowing what Sergeant Harris believed to be pills. *Id.* at 2:20-2:23. Pennington admitted in his deposition that he was trying to swallow the pills because he did not have a prescription for them. Officer Long held Pennington's arms behind his back while Sergeant Harris grasped Pennington's neck. *Id.* at 2:27. The officers repeatedly ordered Pennington to "spit it out." *Id.* at 2:27-2:55.

After about thirty seconds of restraining Pennington in this manner, the officers placed Pennington face-down on the ground. *Id.* at 2:56. Sergeant Harris again instructed Pennington to "spit it out." *Id.* at 2:59. While Sergeant Harris continued to hold Pennington's neck, Officer Long handcuffed Pennington. *Id.* at 2:57-3:46. Once Pennington was handcuffed, Sergeant Harris rolled Pennington onto his back and asked Pennington if he had swallowed the pills. Pennington stated he had not swallowed anything. *Id.* at 3:50-3:56. Sergeant Harris inspected Pennington's mouth with Officer Long's flashlight. *Id.* at 4:03-4:07. Officer Long pointed to Pennington's mouth and said, "It's right there on your teeth." *Id.* at 4:07.

Sergeant Harris returned Officer Long's flashlight. *Id.* at 4:09. He then removed an object from his left holster and disassembled it into two pieces. *Id.* at 4:09-4:11. According to the district court, Sergeant Harris held a flashlight in his left hand and what appeared to be a Taser in his right hand. Although difficult to discern with certainty from the video, we assume that Sergeant Harris did retrieve a Taser from his holster because Sergeant Harris concedes both in his appellate brief and in his affidavit before the district court that he removed a Taser from his holster during the arrest. Appellee Br. 11.

After retrieving these two items, Sergeant Harris turned Pennington from his back onto his left side. R.29, at 4:12. Sergeant Harris then placed his feet on either side of Pennington's body and leaned slightly to the right, making his Taser-bearing right hand roughly parallel with

Pennington's stomach. *Id.* at 4:13. Sergeant Harris's left hand, still grasping the flashlight,[2] pressed Pennington's right side. *Id.* Sergeant Harris again commanded Pennington to "spit it out." *Id.* The video shows that Sergeant Harris's right hand, holding the Taser, came close to the right side of Pennington's stomach but never touched it. As the district court observed, "[t]he video indicates Plaintiff did not convulse and remained lucid throughout the struggle." Pennington did not exhibit any signs of pain or physical agitation at the moment of the alleged tasing. Nor did he make any verbal statement expressing pain or requesting the officers to stop what they were doing. Pennington merely continued to insist he had no pills. *Id.* at 4:14-4:19. During this span of time, Officer Long stood next to Pennington, leaning over him and shining his flashlight near Pennington's face. *Id.* at 4:10-18. Officer Long was not touching Pennington or forcing him to the ground at this point.

Sergeant Harris then stood upright, reconnected the flashlight to the Taser, and holstered it. *Id.* at 4:19-4:25. He stepped away from Pennington and instructed him to lie on his stomach. *Id.* at 4:37. The video next shows Sergeant Harris bending over Pennington; picking up two or three long, thin objects from Pennington's lower back area; and discarding the objects onto the ground nearby. *Id.* at 4:42-4:47. The district court ventured that these objects were "perhaps taser prongs."

Officer Long searched the passenger seat of Caudill's truck and found two syringes. *Id.* at 4:44-5:30. Sergeant Harris searched the ground around Pennington and Pennington's pockets. *Id.* at 5:14-6:53. Sergeant Harris's statement on the video indicates he found one pill in

---

[2] Defendants' brief suggests that Sergeant Harris actually held the Taser's removable cartridge in his left hand rather than a flashlight. Appellee Br. 11. But any debate over whether Sergeant Harris held a flashlight versus a Taser cartridge in his left hand is not pertinent because neither item is capable of delivering an electric shock. The critical question is whether Sergeant Harris's right hand, holding the Taser, made contact with Pennington's body.

Pennington's pocket. *Id.* at 6:53-7:03. The officers state in their affidavits that Sergeant Harris found pills on the ground that Pennington either dropped or spit out.

During and after this search, the officers asked Pennington several times if he needed medical attention because of the drugs he ingested. *Id.* at 6:45-8:47. Each time, Pennington insisted that he was "fine." *Id.* at 6:45-8:47.

The officers took Pennington to Putnam County Jail. On the inmate medical form, Pennington indicated he had no "injuries that need treatment at this time." The drugs Sergeant Harris recovered at the scene were sent to the crime lab and identified as a Schedule III narcotic. Pennington pled guilty to possession of a Schedule III narcotic.

### B.  Procedural History

Pennington filed this § 1983 action pro se against Sergeant Harris and Officer Long alleging excessive force in the course of his arrest. The complaint made no mention of a Taser. When asked in his deposition, "They didn't even pull a taser on you, did they?," Pennington replied, "No. Because I wasn't resisting. I give them no reason."

Defendants filed a motion for summary judgment. They argued that the amount of force used was objectively reasonable and, alternatively, the officers were entitled to qualified immunity.

Several months after Defendants' motion for summary judgment, Pennington filed a pro se, stand-alone, unsworn submission claiming that Sergeant Harris shot him with a Taser from a distance of five feet away as Pennington lay prostrate on the ground. In the submission, Pennington stated that he was unconscious at the time he was tased and did not remember it, but the next day a friend who worked as a corrections officer identified the marks on his body as injuries from a Taser application.

By the time Pennington filed his opposition in response to Defendants' motion for summary judgment, he had obtained counsel. In his response, Pennington continued to modify his story. His opposition to summary judgment argued that Sergeant Harris used excessive force in tasing Pennington while he was lying on the ground and not resisting arrest. The opposition to summary judgment did not rely on Pennington's unsworn submission that he was tased while unconscious but pointed solely to the video evidence already in the record.[3] Defendants responded in their reply that "no Cookeville Police Officer used a taser on Scottie Pennington," citing Pennington's deposition testimony affirming no one used a Taser during the arrest, the officers' affidavits, and the video recording.

### C. District Court Opinion

The district court reviewed the videotape recording Pennington's arrest and concluded that it did not support Pennington's claim in his unsworn submission that while he was unconscious "Sergeant Harris shot the taser at him from a distance of five feet as he lay handcuffed on the ground." The district court agreed, however, that Pennington's claim of "Sergeant Harris holstering the taser and removing the taser the [sic] prongs is consistent with the Court's review."

Operating on the assumption that Sergeant Harris "touch[ed] the taser to Plaintiff's torso briefly" and that Sergeant Harris activated the Taser while it was in contact with Pennington's

---

[3] Had he attempted to do so, Pennington could not have relied on the statements in his unsworn submission to oppose Defendants' motion for summary judgment. Unsworn declarations cannot be relied upon for purposes of opposing a motion for summary judgment. *See* Fed. R. Civ. P. 56(c); *Zainalian v. Memphis Bd. of Educ.*, 3 F. App'x 429, 431 (6th Cir. 2001). Even if Pennington had converted the statements in his unsworn submission into an admissible form, such as an affidavit, a party may not create a fact issue by filing an affidavit that directly contradicts the party's earlier sworn testimony. *See Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986). Pennington's allegation that he was tased directly contradicts his earlier deposition testimony that he was not tased and thus would be inadmissible even if submitted in the correct form.

torso,[4] the district court analyzed whether such conduct violated Pennington's constitutional right to be free from excessive force. The court concluded that even if a jury could find Sergeant Harris tased Pennington, there was no constitutional violation because this action "was reasonable in light of the governmental interests in preservation of evidence and prevention of a potential drug overdose." The court therefore granted summary judgment to Sergeant Harris and Officer Long on the basis of qualified immunity.

## II.      JURISDICTION

The district court had jurisdiction over this § 1983 suit pursuant to 28 U.S.C. § 1343. We have jurisdiction over Pennington's appeal under 28 U.S.C. § 1291 as an appeal from the final decision of a United States district court.

## III.      STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 820 (6th Cir. 2007). We similarly review a lower court's decision granting qualified immunity de novo. *Id.*; *see also Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010).

Summary judgment is proper where the record shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met that burden, the non-moving party must point to evidence supporting its position

---

[4] The district court never explicitly stated that Sergeant Harris activated the Taser, but the court's recitation of the facts as well as its analysis of tasings aimed at preventing drug overdoses and destruction of evidence indicates that it found or assumed that a jury could conclude Sergeant Harris did activate the Taser.

that is "significantly probative" and more than "merely colorable." *Liberty Lobby*, 477 U.S. at 249. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat a motion for summary judgment. *Id.* at 252.

In reviewing an appeal from a grant of summary judgment, we view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.*, 64 F.3d 1015, 1019 (6th Cir. 1995). In the context of qualified immunity, this posture generally requires the court to adopt the plaintiff's version of the facts. *Scott v. Harris*, 550 U.S. 372, 378 (2007). There is an exception, however, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.* at 380. This exception most commonly applies where the record contains a videotape depicting the disputed facts and contradicting one party's version of events. *See id.* at 379-80; *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015). In such a scenario, the court must view the facts "in the light depicted by the videotape." *Scott*, 550 U.S. at 381. The court must draw reasonable inferences in favor of the nonmoving party from the video recording, but only "to the extent supportable by the record." *Id.* at 381 n.8 (emphasis omitted); *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("a court need draw only *reasonable* inferences in favor of the nonmoving party; it need not construe the record 'in such a manner that is wholly unsupportable—in the view of any reasonable jury—by the video recording'" (quoting *Marvin v. City of Taylor*, 509 F.3d 234, 239 (6th Cir. 2007))).

## IV.     ANALYSIS

### A. Is There a Genuine Issue of Material Fact that Sergeant Harris Shot Pennington with a Taser?

Pennington's claim of excessive force, both on appeal and at the district court level, rests solely on his allegation that Sergeant Harris tased him while he was lying on the ground,

handcuffed, and not resisting. Appellant Br. 12. As a result, if Pennington has introduced insufficient evidence to allow a jury to conclude that he was tased, his claim fails regardless of whether such a tasing would violate clearly established constitutional rights as a matter of law.

Pennington concedes that the only evidence he offers to support the tasing is the videotape. Appellant Reply Br. 4-8. Indeed, nothing else in the record suggests a tasing occurred. Pennington testified under oath in his own deposition that the officers never used a Taser.[5] Pennington's medical intake form filled out at Putnam County Jail immediately following the arrest indicates he had no injuries at the time. Neither Sergeant Harris nor Officer Long mentioned a Taser in their initial affidavits, and, following Pennington's opposition to the motion for summary judgment, both submitted additional affidavits denying a Taser was used.

Given that Pennington acknowledges the video is the only evidence supporting his excessive force claim, the existence of a genuine issue of material fact in this case initially turns on whether the video would allow a reasonable jury to find that Sergeant Harris tased Pennington. There are two methods of deploying a Taser: drive-stun mode and dart mode. In drive-stun mode, the operator places the Taser's "two electrode contacts . . . . directly against the

---

[5]Pennington attempts to diminish the self-inflicted damage of his deposition answer by characterizing the defense attorney's question as: 1) a compound question, and 2) an ambiguous question. Appellant Reply Br. 6. Neither strategy succeeds. First, Pennington did not respond to a compound question but rather to a statement followed by a question: "Well, nobody pulled a gun on you. They didn't even pull a taser on you, did they?" Second, neither the question nor the answer is ambiguous, especially when read in the full context of Pennington's response. Pennington did not merely respond, "No," when defense counsel asked, "They didn't even pull a taser on you, did they?," but further explained, "No. Because I wasn't resisting. I give them no reason," making clear his understanding that no Taser was used.

The dissent similarly dismisses the contradiction between Pennington's deposition testimony, given while proceeding pro se, and his later statements in the response to the motion for summary judgment as an "expected and appropriate" "development of the facts" following Pennington's securing of counsel. Dissenting Op. at 26 n.1. But the difference between Pennington's deposition testimony (that he was not tased) and his later claim (that he was tased) is more than a development of facts—it is an outright reversal. *See, e.g.*, Pl.'s Mem. in Opposition to Mot. for Summ. J. at 2, ("Then, Harris shoots him in the back with the tazer even though Penning is being held by Long and was not resisting. Harris is then seen taking the tazer prongs out of Pennington's back and putting them into his tazer." [sic throughout]). While the addition of counsel can foreseeably result in the development of legal theories and litigation strategies, it is neither expected nor appropriate for it to produce a complete transformation of the client's story.

victim" to deliver an electric shock. *Cockerell v. City of Cincinnati*, 468 F. App'x 491, 492 (6th Cir. 2012) (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011) (en banc)). To apply a Taser in dart mode, the operator discharges the Taser to propel a pair of probes that deliver an electric charge into the target's muscles. *Id.* In dart mode (but not in drive-stun mode), the electric charge overrides the target's central nervous system. *Id.* The district court apparently accepted Pennington's argument that the video created a genuine fact issue as to whether Pennington was tased, describing the video as showing that "Sergeant Harris appeared to touch the taser to Plaintiff's torso briefly" and Sergeant Harris "appeared to unpluck two objects, perhaps taser prongs, from Plaintiff's body."

After careful review of the footage, we conclude that the video does not support a reasonable jury finding that Sergeant Harris tased Pennington in either drive-stun or dart mode. The image is clear enough to discern what happened and, more importantly, what did *not* happen. The video's visual and audio quality need not be flawless for us to conclude that it fails to support, and in fact "blatantly contradict[s]," Pennington's story, "such that no reasonable jury could believe it." *Scott*, 550 U.S. at 380.

The video shows that as Sergeant Harris leaned over Pennington's body, his Taser neared the right side of Pennington's torso but never touched it. The video also shows that no probes or prongs ever shot out of the Taser. Pennington does not convulse or otherwise physically react at the moment of the alleged tasing. At most, Pennington incoherently yells, but that action fits seamlessly into Pennington's ongoing verbal protests throughout the arrest, rather than representing a sudden reaction to an electric jolt. When Sergeant Harris later removes what the district court speculated may have been Taser prongs from Pennington's body, the objects are located not on the right side of Pennington's stomach where Sergeant Harris's Taser came

-10-

closest, but rather near his lower back—a region Sergeant Harris's Taser-bearing right hand never approached. An inference that the unknown objects were Taser prongs that pierced Pennington's body is not reasonably supported by the record where the video establishes that no tasing occurred at all, much less to Pennington's lower back area.[6]

The video shows only that Sergeant Harris removed a Taser from his holster, held it inches away from the right side of Pennington's body, and never brought it into direct contact with Pennington's body. Drawing all reasonable inferences in Pennington's favor, Sergeant Harris's behavior demonstrates that he may have thought about and even momentarily intended to tase Pennington. But the critical fact is that he could not have tased Pennington based on the movements in the video. At best, the video provides a "scintilla of evidence" in support of Pennington's claim that he was tased. *Liberty Lobby*, 477 U.S. at 252. Absent any other suggestion in the record indicating a tasing occurred, and—indeed—given evidence in Pennington's own deposition testimony to the contrary, the video's meager shred of evidentiary support cannot justify a reasonable jury ruling in Pennington's favor on his excessive force action.

The principle from *Scott v. Harris*, which both parties urge the court to apply here, requires the same conclusion. The video "blatantly contradict[s]" Pennington's story that Sergeant Harris tased him. *Scott*, 550 U.S. at 380. As a result, we must view the facts "in the light depicted by the videotape" rather than in the light most favorable to Pennington. *Id.* at 380-

---

[6] We acknowledge that if the Taser was used in drive-stun mode, no probes or prongs would shoot out of the Taser, nor would application of the Taser "cause an override of the victim's central nervous system." *Cockerell*, 468 F. App'x at 492 (quoting *Mattos*, 661 F.3d at 443). Pennington, however, argued in his opposition to summary judgment that the video shows Sergeant Harris "taking the tazer [sic] prongs out of Pennington's back," suggesting that Pennington believed the Taser was deployed in dart mode. The district court accordingly considered the possibility that the Taser was used in dart mode, and we similarly make these points about the probes and the lack of convulsion to show that the video forecloses the possibility that Sergeant Harris deployed the Taser in dart mode. Although Pennington has not expressly argued Sergeant Harris used the Taser in drive-stun mode, we observe that other indications from the video foreclose the possibility of deployment in drive-stun mode: the lack of contact between the Taser and Pennington's body, and the absence of a reaction from Pennington.

81. Because the video shows that no tasing occurred, it dissolves any benefit of the doubt we would otherwise be obliged to give Pennington's assertions.

In other words, the existence of a videotape contradicting Pennington's assertion that he was tased simultaneously precludes this court from accepting his version of events and dispels the only evidence Pennington offers in support of his claim. Therefore, we affirm the district court's grant of summary judgment to Sergeant Harris and Officer Long on the grounds that Pennington failed to meet his burden of producing evidence in support of his excessive force claim.

**B. Even If There Were a Genuine Issue of Material Fact as to Whether Sergeant Harris Tased Pennington, Would the Officers Be Entitled to Qualified Immunity?**

Assuming that a reasonable jury could accept Pennington's strained interpretation of the videotape, Sergeant Harris and Officer Long would be entitled to qualified immunity based on the set of facts confronting them when Sergeant Harris allegedly deployed his Taser.

**1. Qualified Immunity**

Qualified immunity shields police officers from civil liability unless the plaintiff can show: (1) the official violated a statutory or constitutional right, and (2) that right was "clearly established" at the time of the challenged action. *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts have discretion to analyze these steps in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Bypassing the constitutional question is particularly appropriate where "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237.

An officer's use of force does not run afoul of the Fourth Amendment as long as "the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting

them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Evaluating the reasonableness of a particular use of force "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). The Supreme Court has specified three factors relevant to assessing the reasonableness of a particular application of force: the severity of the crime at issue, whether the suspect posed an immediate threat of safety, and whether the suspect was actively resisting arrest or attempting to flee. *Id.* These factors, however, are not exhaustive. *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005). Furthermore, courts must judge the reasonableness of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Even if an officer's actions amount to unconstitutional excessive force, qualified immunity will still apply if the violated right was not "clearly established." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Kijowski v. Niles*, 372 F. App'x 595, 600 (6th Cir. 2010). An officer's conduct violates clearly established law "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Although there need not be a case directly on point for the law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Stanton v. Sims*, 134 S. Ct. 3, 5 (2013) (quoting *al-Kidd*, 131 S. Ct. at 2083). When a plaintiff can identify "cases of controlling authority in the[] jurisdiction at the time of the incident" or "a consensus of cases of persuasive authority"

affirming the allegedly violated right, the law is clearly established. *Wilson v. Layne*, 526 U.S. 603, 617 (1999).

The Supreme Court has repeatedly warned lower courts against defining the right "at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *al-Kidd*, 131 S. Ct. at 2084). Rather, the clearly established inquiry "must be undertaken in light of the specific conduct of the case," *id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)), meaning the court must enunciate "a concrete, particularized description of the right," *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012). The Supreme Court recently instructed in *Mullenix v. Luna* that where "none of our precedents 'squarely governs'" the specific set of facts at hand, qualified immunity is proper. *Mullenix*, 136 S. Ct. at 310.

### 2. Clearly Established Analysis

Defining the right at issue in this case, therefore, demands a careful compilation of the relevant facts confronting the officers at the moment Sergeant Harris allegedly deployed his Taser.

For the first time on appeal, Pennington argues that the video shows Sergeant Harris tased Pennington only after inspecting his mouth and determining he had *already* swallowed the narcotics.[7] Appellant Br. 15. Issues not raised before the district court are generally inappropriate for appellate consideration. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th

---

[7] Pennington further contends that this version of facts is consistent with the district court's assessment of the evidence, citing the district court's observation that the officers, as they were inspecting Pennington's mouth the moment before the tasing, "remarked that they could see orange residue on Plaintiff's tongue and teeth, indicating that Plaintiff had ingested the pills." Appellant Br. 15-16. While Pennington's citation to the district court's opinion is accurate, the district court's representation of the video evidence is not. During the first inspection of Pennington's mouth preceding the alleged tasing, Officer Long does point to Pennington's mouth and say, "It's right there on your teeth." R. 29, at 4:07. But it is several minutes after the supposed tasing when, looking in Pennington's mouth a second time, Officer Long states, "His tongue's orange." *Id.* at 7:01. Therefore, the district court's statement that the officers saw "orange residue on Pennington's tongue and teeth" before the alleged tasing was, in fact, unsupported by the officer's comments on the video.

Cir. 2008). In order to "preserve the integrity of the appellate structure," this Court has refused to act the part of "a 'second shot' forum, a forum where secondary, back-up theories may be minted for the first time." *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 590 (6th Cir. 2002) (quoting *Isaak v. Trumbull S & L Co.*, 169 F.3d 390, 396 n.3 (6th Cir. 1999)). This principle applies with even greater force when the issue "necessitates a determination of facts." *Taft Broad. Co. v. United States*, 929 F.2d 240, 244 (6th Cir. 1991); *see also Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 217 (6th Cir. 1985).

Pennington's theory that the officers knew he swallowed the pills before tasing him is a fresh argument on appeal—not merely an expansion of his position below, as the dissent avers. Dissenting Op. at 30-32. In his opposition to Defendants' motion for summary judgment before the district court, Pennington argued only that he was "handcuffed" and "not resisting" when Sergeant Harris tased him. He made no allusion whatsoever to the status of the pills at that point in time. Moreover, he chose not to respond to Defendants' statements in their motion for summary judgment arguing that Sergeant Harris "used reasonable force to prevent the destruction of evidence and the ingestion of the illegal narcotics," as well "used reasonable force in determining whether or not Mr. Pennington continued to have illegal narcotics in his mouth and at the scene." Regardless of whether Defendants' statements about their efforts to prevent the destruction of evidence and ingestion of narcotics referred to the force before or during the alleged tasing, Pennington had the burden to preserve an issue critical to his theory of excessive force: that he was tased without justification. The fact that the district court ultimately researched and considered an issue related to Pennington's new argument, whether the alleged tasing was justified to prevent destruction of evidence, does not do away with this duty of preservation. *Cf. Scottsdale*, 513 F.3d at 552-54 (refusing to consider a new argument raised in

plaintiff's district court reply brief even though the district court squarely addressed the argument in its final order).

Moreover, Pennington's newly raised argument is a largely factual one that the district court should have been given the opportunity to consider and resolve. An exception to the general rule against considering newly raised issues on appeal applies where the new issue "presents *only* a question of law." *Taft Broad. Co.*, 929 F.2d at 244 (emphasis added). The dissent construes Pennington's newly raised issue as purely legal because conducting a qualified-immunity analysis does not require the court to make factual determinations. Dissenting Op. at 33. But evaluating whether an officer's actions were objectively reasonable under the Fourth Amendment necessarily entails reference to the factual record as well as a determination of whether one party's story is blatantly contradicted by the record under *Scott v. Harris*. The fact that Pennington's argument implicates factual considerations, even if it also implicates legal ones, militates against review of this issue. *See, e.g.*, *Hayward v. Cleveland Clinic Found.*, 759 F.3d 601, 615 (6th Cir. 2014) (refusing to consider whether a legal exception to the *Heck* doctrine applied because "a district court should have had the opportunity to consider the facts in this case to determine whether [the exception] applies"); *Friendly Farms v. Reliance Ins. Co.*, 79 F.3d 541, 545 (6th Cir. 1996) (refusing to consider the newly raised legal issue of when a party discovered its loss under an insurance contract because deciding the issue "would require reference to the underlying factual record").

In addition, even if Pennington's argument does not cause unfair prejudice to Defendants on appeal, preventing unfair surprise is only one reason for the general rule against entertaining new issues on appeal. The other reason—"to preserve the integrity of the appellate structure," *Mich. Bell Tel. Co.*, 305 F.3d at 590, and "to ease[] appellate review," *Scottsdale*, 513 F.3d at

552, — applies with full force to this situation. The district court neither heard nor considered Pennington's argument, making it impossible for us to review the district court's actions with regard to this argument. *See Estate of Quirk v. C.I.R.*, 928 F.2d 751, 758 (6th Cir. 1991) (explaining that courts should refrain from hearing new arguments on appeal to avoid "usurping the role of the first-level trial court with respect to the newly raised issue rather than reviewing the trial court's actions" (quoting *Anschuz Land & Livestock Co. v. Union Pacific R.R. Co.*, 820 F.2d 338, 344 n.5 (10th Cir. 1987))). Therefore, we decline to consider Pennington's newly raised argument that Sergeant Harris tased him only after ascertaining Pennington had already swallowed the pills.

The issue thus becomes whether Pennington had a clearly established right as of March 2, 2012 not to be tased when, on the one hand, he did not threaten the officers, was not resisting arrest, and was not attempting to flee, but on the other hand, was attempting to destroy evidence, disobeying police orders to spit out the pills, and potentially putting himself at risk of harm. As the district court observed, Sixth Circuit precedent clearly establishes that using a Taser on a non-resistant, non-threatening person violates the Fourth Amendment. *See, e.g.*, *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012); *Kijowski*, 372 F. App'x at 600-01. The district court, however, identified two governmental interests making the use of a Taser constitutional in this case: (1) prevention of a potential drug overdose, and (2) preservation of evidence. While we reserve judgment on the constitutional question, an examination of controlling and persuasive case law demonstrates that it was not clearly established as of March 2, 2012 that using a Taser in furtherance of these two legitimate governmental interests violated the Fourth Amendment.

The Sixth Circuit recognized prevention of a drug overdose as a legitimate law enforcement objective warranting the use of force in *Monday v. Oullette*, 118 F.3d 1099 (6th Cir. 1997). In *Monday*, officers responded to a radio dispatch reporting that the plaintiff, Monday, had ingested pills and was drinking alcohol in an attempt to end his life. *Id.* at 1101. Upon arriving, the officers counted Monday's prescription Xanax pills and determined that at least twenty were missing. *Id.* After Monday refused to go to the hospital voluntarily for twenty minutes, the defendant, Officer Oullette, discharged pepper spray in Monday's face to force him onto a stretcher so emergency personnel could take him to the hospital. *Id.* The court held that Oullette's use of the pepper spray was reasonable because Oullette had reason to believe Monday had overdosed on his medication and could suffer serious physical consequences if Oullette failed to act. *Id.* at 1104.

More generally, the Sixth Circuit has recognized that law enforcement may constitutionally apply force to neutralize a safety threat to the plaintiff himself. *See Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 96 (6th Cir. 2012) (holding use of a Taser objectively reasonable to subdue an intoxicated, resistant plaintiff partly because the plaintiff was suicidal and thus "at a minimum, he was a threat to his own safety"); *Williams v. Sandel*, 433 F. App'x 353, 361-63 (6th Cir. 2011) (holding baton strikes, pepper spray, and thirty-seven Taser deployments objectively reasonable to restrain an intoxicated, naked suspect resisting and fleeing officers along a major interstate because the suspect "posed an immediate threat to the safety of *himself* and the officers, as well as passing motorists" (emphasis added)); *Cabaniss v. City of Riverside*, 231 F. App'x 407, 413-14 (6th Cir. 2007) (finding no constitutional violation when an officer pepper-sprayed a handcuffed arrestee sitting in the backseat of the police car because the

reportedly suicidal arrestee was banging his head against the plexiglass, thus posing "a real threat to his own safety").

No Sixth Circuit case or lower court case within the Sixth Circuit, however, has addressed the specific balance between a subdued, non-threatening individual's right not to be tased and the governmental interest in preventing a potential drug overdose. One lower, out-of-circuit case has ruled, on facts similar to this case, that multiple applications of a Taser to force a suspect to spit out a bag of cocaine was a reasonable use of force to thwart a potentially fatal overdose. *Ellis v. Columbus Police Dep't*, No. 1:07CV124-A-A, 2009 WL 1663454, at *5-6 (N.D. Miss. June 15, 2009).

The Sixth Circuit has also recognized preservation of evidence as a valid governmental interest in the context of warrantless entries but has never addressed its status in excessive force cases. *See, e.g.*, *United States v. Campbell*, 261 F.3d 628, 632-33 (6th Cir. 2001) (holding a warrantless entry constitutional where officers reasonably believed a suspect would immediately destroy a package of methamphetamine upon opening it and discovering the police-planted transmitting device). A few other federal appellate courts, however, have recognized preservation of evidence as a legitimate reason for a police officer's application of force as of March 2, 2012. *See Sanders v. City of Dothan*, 409 F. App'x 285, 290 (11th Cir. 2011) (holding use of a Taser to force an arrestee to open his mouth did not violate a clearly established right where the officer reasonably believed the arrestee was trying to swallow drugs); *United States v. Harrison*, 432 F.2d 1328, 1329-30 (D.C. Cir. 1970) (denying a motion to suppress evidence of illegal narcotics obtained by grabbing the defendant's throat to prevent the defendant from swallowing the narcotics because these tactics were a reasonable use of force); *Espinoza v. United States*, 278 F.2d 802, 803-04 (5th Cir. 1960) (denying a motion to suppress evidence of

illegal narcotics obtained by grabbing the defendant's throat, choking him, and prying open his mouth because the officers used "no more force than was reasonably necessary under the circumstances"). For example, the Eleventh Circuit has twice held that tasing an individual who officers reasonably believed was attempting to swallow and destroy evidence of illegal drugs did not violate a clearly established right. *See Sanders*, 409 F. App'x at 290; *German v. Sosa*, 399 F. App'x 554, 557 (11th Cir. 2010) (per curiam). The court in *Sanders* reasoned that tasing an uncooperative arrestee for one to two seconds to prevent the destruction of contraband by swallowing could not clearly violate constitutional rights without a decision on point. *Sanders*, 409 F. App'x at 290.

Several lower courts and at least one state supreme court have also upheld law enforcement's use of force, including Tasers and mace, to prevent the destruction of evidence. *See Morris v. Tulsa Police Dep't*, No. 09-CV-797-JHP-TLW, 2011 WL 1542920, at *5 (N.D. Okla. Apr. 21, 2011) (upholding the use of a Taser where the plaintiff ingested cocaine in an attempt to destroy evidence and fought with police officers); *Barber v. Santa Maria Police Dep't*, No. CV 08-6273-DMG (MLG), 2010 WL 5559708, at *8 (C.D. Cal. Sept. 1, 2010) (finding knee strikes to the plaintiff's neck and face objectively reasonable where the plaintiff refused to obey officers' orders during a strip search, attempted to stuff the contents of a bag down a drainage pipe, and resisted officers' efforts to restrain the plaintiff); *Simms v. City of Harrodsburg*, No. 06-CV-104-JMH, 2007 WL 2792174, at *4 (E.D. Ky. Sept. 21, 2007) (finding that dragging a suspect who was attempting to destroy evidence of methamphetamine manufacture during the execution of a search warrant was objectively reasonable to stop the plaintiff from destroying evidence and resisting arrest); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 313-15 (S.D.N.Y. 1998) (finding a discharge of pepper spray reasonable to induce

an arrestee to spit out contraband); *United States v. Holloway*, 906 F. Supp. 1437, 1442-43 (D. Kan. 1995) (denying a motion to suppress evidence obtained from the defendant's mouth by using pepper spray because this method was not unreasonable or shocking to the conscience); *State v. Jacques*, 587 P.2d 861, 865 (Kan. 1978) (affirming the trial court's refusal to suppress evidence obtained by spraying the defendant with Mace because an officer "has the right and duty to take reasonable measures to ensure that incriminating evidence is not destroyed," including by "reasonable force to . . . prevent the defendant from swallowing the evidence").

Other courts have found use of a Taser to prevent destruction of evidence objectively unreasonable, particularly where the facts featured multiple tasings or where the destruction of evidence was unlikely. *See Brown v. City of Golden Valley*, 534 F. Supp. 2d 984, 993 (D. Minn. 2008) (denying qualified immunity where an officer tased a car passenger who had tumblers containing alcohol at her feet because the passenger never reached for the tumblers to destroy them or use them as a weapon); *Hereford v. Texas*, 339 S.W.3d 111, 125-26 (Tex. Crim. App. 2011) (upholding a lower court decision finding objectively unreasonable eight applications of a Taser to an arrestee at a hospital some time after two unsuccessful tasings during the initial arrest to force the arrestee to spit out the cocaine in his mouth, even though the arrestee was no longer attempting to swallow the drugs). But as of March 2012, no Sixth Circuit cases, and only one unpublished district court case within the Sixth Circuit, had addressed whether any measure of force was objectively reasonable to preserve evidence in the process of being destroyed.

The case at hand implicates both of these legitimate governmental interests: preventing a potential drug overdose and preserving evidence. Sergeant Harris witnessed Pennington surreptitiously place pills in his mouth, action that reasonably appeared to be an effort to swallow and destroy the drugs. Pennington later acknowledged that he intended to destroy evidence by

swallowing the pills. As depicted in the video, Sergeant Harris and Officer Long ordered

Pennington multiple times to spit out the pills, but Pennington continued to insist he had none,

despite his evident attempt (as shown on the video) to swallow something without Officer Long

noticing. The officers thus had good reason to believe Pennington was attempting to destroy

evidence. Additionally, because the officers could not know exactly what or how many narcotics

Pennington had consumed, they reasonably believed Pennington might be at risk of an adverse

reaction or overdose.[8]

Assuming counterfactually that Sergeant Harris tased Pennington, Pennington cannot

muster the necessary "controlling authority" or "consensus of cases of persuasive authority"

establishing a right not to be tased in this situation. *Wilson*, 526 U.S. at 617. None of our

precedents "squarely governs" this case. *Mullenix*, 136 S. Ct. at 310. While the Sixth Circuit

has recognized a valid governmental interest in preventing drug overdoses in an excessive force

case, *see Monday*, 118 F.3d 1099, as well as a valid governmental interest in preventing

destruction of evidence in other contexts, it has never discussed the boundaries of those interests

under facts even roughly analogous to this case. The persuasive authority on this subject itself is

not substantial, but, if anything, it actually points to an opposite conclusion: namely, that

Sergeant Harris's conduct in this case was not unconstitutional or at least did not violate clearly

established rights. *See Sanders*, 409 F. App'x 285; *German*, 399 F. App'x 554; *Morris*, 2011

WL 1542920; *Barber*, 2010 WL 5559708; *Singleton*, 1 F. Supp. 2d 306. The dearth of Sixth

---

[8] The officers' repeated inquiries as to whether Pennington required medical attention tend to demonstrate their subjective concern about the effect of the drugs on Pennington's health, but the standard for excessive force is objective—that is, "whether the officers' actions are 'objectively reasonable' in light of *the facts and circumstances confronting them*, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (emphasis added). The clearly established analysis is also objective—whether "every '*reasonable official* would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (emphasis added) (quoting *Creighton*, 483 U.S. at 640). As a result, the officers' subjective belief that Pennington might be in physical danger from ingesting the drugs does not affect our analysis as to whether a reasonable officer in Sergeant Harris's situation would have known that tasing Pennington violated a clearly established right.

Circuit precedent and case law in general addressing—much less condemning—the use of force to prevent a drug overdose or to preserve evidence would not put a reasonable officer on notice that discharging a Taser to accomplish these goals violated constitutional rights. Without deciding the underlying constitutional issue of whether tasing Pennington constituted excessive force, we hold that it was not clearly established as of March 2, 2012 that tasing an arrestee attempting to swallow illegally possessed drugs constituted excessive force. Because we cannot say every reasonable official would have known it was excessive force to tase an individual attempting to destroy evidence and potentially endangering him or herself in the process, Sergeant Harris and Officer Long would be entitled to qualified immunity even if there were a genuine issue of material fact as to whether Sergeant Harris tased Pennington.

### C. Officer Long's Independent Entitlement to Qualified Immunity

Additionally, even if we were to hold that Sergeant Harris's deployment of a Taser in this situation violated clearly established rights, Officer Long would be entitled to qualified immunity on yet another basis: lack of opportunity to intervene.

Liability for excessive force requires a showing that the defendant either (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force. *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). Because Officer Long did not himself discharge the Taser, did not hold or restrain Pennington while Sergeant Harris allegedly discharged the Taser, and did not exercise any authority over Sergeant Harris, the only basis for Officer Long's liability would be failure to protect Pennington against the use of excessive force.

An officer may be liable for failing to prevent an act of excessive force if he or she: (1) observed or had reason to know that excessive force would be or was being used, and (2) had

both the opportunity and means to prevent the harm from occurring. *Id.* Where an act of excessive force unfolds in a matter of seconds, the second requirement is generally not satisfied. *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 506 (6th Cir. 2007). This court has reasoned that it demands too much of officers to require that they intervene within a sudden and quickly-expired moment of opportunity. *See id.* at 506-07. We have twice applied this rationale to cases involving use of a Taser, finding that nearby officers lacked a realistic opportunity to stop a tasing that occurred for a single, transitory moment. *See Wells v. City of Dearborn Heights*, 538 F. App'x 631, 640 (6th Cir. 2013) (finding no opportunity to intervene and prevent a knee strike and a single tasing because the acts occurred "at two discrete, fleeting points in time" and did not develop into an "extended string of abuses"); *Kowolonek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (finding no opportunity for officers to prevent a tasing that "could only have lasted for a fraction" of the entire incident, which itself "lasted only 'minutes'"); *cf. Goodwin v. City of Painesville*, 781 F.3d 314, 329 (6th Cir. 2015) (finding sufficient opportunity for officers to intercede during a "prolonged application of force": a twenty-one second tasing followed by an additional five-second tasing). We have similarly found insufficient opportunity to intervene in other types of excessive force that lasted less than ten seconds. *See Burgess v. Fischer*, 735 F.3d 462, 476 (6th Cir. 2013) (holding that an officer and nurse lacked opportunity to intercede in a takedown that lasted no more than ten seconds); *Ontha*, 222 F. App'x at 506-07 (holding that an officer who was a passenger in a patrol car that ran over a fleeing suspect lacked opportunity to develop preventative measures "within a short time span of six to seven seconds").

Much like the isolated and brief tasings that left insufficient opportunity for intervention in *Wells* and *Kowolonek*, the alleged tasing in this case occurred a single time and lasted mere

seconds. Measured by the amount of time Sergeant Harris held the Taser near or on Pennington's body, the alleged excessive force lasted about three seconds. Measured from the moment Sergeant Harris retrieved his Taser until he returned it to his holster, the purported excessive force lasted seven seconds. By either measure, Officer Long lacked a realistic opportunity to stop Sergeant Harris from discharging the Taser. In this fleeting span of time, Officer Long would have had to realize what Sergeant Harris intended to do, recognize that action was unconstitutional, develop a plan to prevent the tasing, and execute that plan. As our case law acknowledges, it is impractical to expect an officer to proceed through these steps in less than eight seconds. Pennington makes no allegation that he was tased multiple times or otherwise suffered a "a prolonged application of force" that would lend Officer Long more time to recognize the nature of Sergeant Harris's actions and take action to stop it. *Goodwin*, 781 F.3d at 329. Therefore, even if Sergeant Harris's use of the Taser violated clearly established rights, Officer Long is entitled to qualified immunity because he lacked a realistic opportunity to prevent the tasing.

## V. CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the district court granting summary judgment to Sergeant Harris and Officer Long.

**KAREN NELSON MOORE, Circuit Judge, dissenting**.  I would hold that there is a genuine dispute of material fact as to whether the use of force was excessive, that appellant has not waived his argument on appeal, and that neither officer is entitled to qualified immunity.

### I.  Whether There is a Genuine Dispute of Material Fact

Like *Scott v. Harris*, this case hinges on a videotape of the incident.  550 U.S. 372, 378 (2007).  But unlike *Scott v. Harris*, the videotape does not warrant summary judgment, as it does not foreclose Scottie Pennington's version of the facts.[1]  *See id.* at 386.

The videotape is far from a pellucid recording:  the audio is muffled and the image quality is poor.  The videotape also goes in and out of focus and, perhaps coincidentally and perhaps not, is out of focus during the most crucial moments of the arrest.  When the officers first pull up behind Robert Caudill, and Brian Long walks up to the passenger's side of Caudill's truck, the image is clear enough to see Long's duty belt and to distinguish the different objects attached to it (one, which he rests his left hand on momentarily, is in the shape of a gun or a taser).  R. 29 (Videotape at 1:26–2:04) (Page ID #167).  Less than a minute later, as Long and James Harris hold Pennington and tell him to spit out the pills he has swallowed, the image goes out of focus.  *Id.* at 2:29–2:50.  Though the viewer should be able to see Harris's duty belt and the objects attached to it, as Harris's side and part of his back are turned toward the camera, the image is too blurry to make them out with any confidence.  The image is clearer as the officers pin Pennington down on his stomach and Long handcuffs Pennington.  *See id.* at 3:03–3:21.

---

[1] Though Pennington's version of events has evolved since he filed his complaint, he was proceeding pro se for the first part of the litigation (including when he was deposed).  He did not secure counsel until shortly before he filed his response to defendants' motion for summary judgment.  *See* R. 47 (Notice of Appearance) (Page ID #213).  Thus, some development of the facts was both expected and appropriate.

The videotape goes out of focus again when Harris flips Pennington over on his back. *See id.* at 3:47–3:54. Long, standing up, holds a flashlight in his right hand and points it at Pennington. *Id.* at 3:54–3:58. Harris, standing to Long's right, reaches for Long's flashlight with his left hand. *Id.* at 4:01. Harris bends over, passes the flashlight from his left hand to his right hand, and shines it in Pennington's mouth. *Id.* at 4:02–4:04. Long bends down, joining Harris, and points at Pennington's mouth, remarking, "it's right there on your teeth." *Id.* at 4:04–4:06. Harris then stands up and hands the flashlight to Long, passing it back from his right hand to his left hand. *Id.* at 4:06–4:08. Harris then reaches his right hand around his body to his duty belt and grabs a dark object—an object which we know is a taser because Harris swore it was in an affidavit before the district court. *Id.* at 4:08–4:09; *see also* R. 57-2 (Second Harris Affidavit at 1) (Page ID #244). The taser, against Harris's dark uniform and the night sky, is barely discernable: it is only Harris's hand, which looks like it is holding something, that suggests its presence.[2] R. 29 (Videotape at 4:08–4:09) (Page ID #167). Harris says "here, here you go," turns Pennington over, and straddles him. *Id.* at 4:09–4:12. Bending over Pennington, Harris moves his right hand, which appears to still have the taser in it, toward Pennington's shoulder or side:

---

[2] The majority acknowledges how hard it is to see the taser: "Although difficult to discern with certainty from the video, we assume that Sergeant Harris did retrieve a [t]aser from his holster because Sergeant Harris concedes both in his appellate brief and in his affidavit before the district court that he removed a [t]aser from his holster during the arrest." Maj. Op. at 3.



*Id.* at 4:14. Pennington says "oh, oh, I ain't got it!" *Id.* at 4:14–4:16. As he does, the image snaps back into focus, and Harris can be seen more clearly, the taser in his right hand and a smaller object in his left hand. *Id.* Harris appears to attach the smaller object to the front of the taser, which he then holsters. *Id.* at 4:16–4:22.

Though the viewer can glean the broad strokes of what happened from the videotape, the viewer cannot determine the specific details with any certainty, and it is the specific details that

are critical to Pennington's case. The majority's error is in treating the videotape as if it depicts *all* details clearly such that the majority can simply view the videotape, compare it to Pennington's version of the incident, and conclude that the videotape forecloses his claim. *See* Maj. Op. at 10–11.

For example, the majority asserts that "Harris's right hand, holding the [t]aser, came close to the right side of Pennington's stomach but never touched it." *Id.* at 4. Later in its opinion, the majority goes even further, claiming that "Harris removed a [t]aser from his holster [and] held it inches away from the right side of Pennington's body"—a fine line to draw for such a blurry video. *Id.* at 11. The majority further asserts that in response to Harris's movements, "Pennington did not exhibit any signs of pain or physical agitation." *Id.* at 4.

The problem with these statements is that the videotape does not support them. The outline of the taser is barely discernable. R. 29 (Videotape at 4:08–4:09) (Page ID #167). It is impossible to tell how close the taser gets to Pennington, and whether it touches him. *Id.* As for Pennington's reaction, when Harris moves his right hand toward Pennington, Pennington lets out what sound like two cries (the district court described them as "two short yells") before he says "I ain't got it!" *Id.* at 4:14–16: R. 69 (Dist. Ct. Op. at 3) (Page ID #287). Admittedly, these cries may not be in reaction to the taser. Indeed, they may not even be cries: Pennington may simply be raising his voice in agitation. But the videotape is not clear either way.

What the majority has done is make its own factual determinations. And in making these determinations, the majority has overlooked the genuine disputes of material fact that the videotape creates. Because it is not clear whether the taser touched Pennington or whether he reacted to it, these questions deserve to go to a jury. It is not our place to decide them. Taking the evidence, blurry as it is, in the light most favorable to Pennington, the majority should have

concluded that a reasonable jury could find that Harris's taser touched Pennington and that Pennington reacted with two cries. The videotape is far too unclear and Pennington's claim far too nuanced for the videotape to warrant summary judgment.[3]

## II. Whether Pennington Waived his Qualified-Immunity Argument

On appeal, Pennington argues that Harris cannot claim to have tasered Pennington to preserve evidence or prevent an overdose, as Harris had already checked Pennington's mouth and knew there were no pills in it. Appellant Br. at 19–20. The majority refuses to consider this argument because "[i]ssues not raised before the district court are generally inappropriate for appellate consideration." Maj. Op. at 14–15 (citing *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008)). I do not think this argument can be fairly characterized as an issue not raised before the district court; it is simply an expansion of Pennington's response to defendants' claim of qualified immunity—one that is warranted in light of the district court's opinion. Even if it is a newly raised issue, our precedent establishes simply a general rule against considering it, not an absolute bar. Because Pennington's argument does not unfairly prejudice defendants or require a factual determination, an exception to the general rule is appropriate.

Pennington brought an excessive-force claim in his complaint before the district court. R. 1 (Compl. ¶ 11) (Page ID #3). Defendants responded with a motion for summary judgment arguing that there was no genuine dispute of material fact and that, in the alternative, the officers were entitled to qualified immunity. R. 20 (Mot. for Summ. J. at 1–5) (Page ID #46–50). In

---

[3] The majority's statements also imply that the district court's conclusions were unreasonable. Maj. Op. at 8 (explaining that "a court need draw only *reasonable* inferences in favor of the nonmoving party; it need not construe the record in such a manner that is wholly unsupportable—in view of any reasonable jury—by the video recording" (emphasis in original) (internal quotation marks omitted) (quoting *Shreve v. Franklin Cty.*, 743 F.3d 126, 132 (6th Cir. 2014))); R. 69 (Dist. Ct. Op. at 3) (Page ID #287) (observing that "Harris appeared to touch the taser to [Pennington's] torso briefly" and that "[Pennington] gave two short yells").

their memorandum, defendants listed five facts that they claimed the videotape established, including that Harris "used reasonable force to prevent the destruction of the evidence and the ingestion of the illegal narcotics" (a fact defendants listed immediately before the fact that Harris and Long "used reasonable force in placing Mr. Pennington on the ground and applying the handcuffs to him"). R. 27 (Mem. in support of Mot. for Summ. J. at 23) (Page ID #156). The order of these facts suggests that the force to which defendants were referring in the earlier fact was the force Harris used when lunging at Pennington, not when tasering him, which was done after Pennington was handcuffed.

Defendants also never explicitly connected their contention that Harris "used reasonable force to prevent the destruction of the evidence and the ingestion of the illegal narcotics" to their contention that Harris was entitled to qualified immunity. After listing the remaining facts, defendants concluded, "The video clearly and conclusively establishes that neither Sergeant Harris nor Officer Brian Long were guilty of excessive force as a matter of law and the force which they used was objectively reasonable under the circumstances." *Id.* at 24 (Page ID #157). Defendants then asserted, "In the alternative, these Officers are entitled to qualified immunity." *Id.* To be clear, nowhere in their memorandum did defendants advance the argument that Harris was trying to preserve evidence and prevent an overdose by tasering Pennington, and that these objectives entitled him to qualified immunity. In response, Pennington, not surprisingly, argued only that the officers were not entitled to qualified immunity because he was not actively resisting when they tasered him. R. 56 (Resp. to Mot. for Summ. J. at 3) (Page ID #235).

Defendants did not further develop their argument that Harris "used reasonable force to prevent the destruction of the evidence and the ingestion of the illegal narcotics" in their reply brief. R. 57 (Reply Br. at 1–3) (Page ID #237–39). The district court, however, did: in its

opinion, it explained that the use of a taser may be reasonable where a suspect poses a threat to a law-enforcement aim, such as the preservation of evidence or the prevention of an overdose. R. 69 (Dist. Ct. Op. at 9–10) (Page ID #293–94) (citing *Boyden v. Twp. of Upper Darby*, 5 F. Supp. 3d 731, 738 (E.D. Pa. 2014); *Love v. Rockford Ill. Mun. Police Dep't*, No. 08 C 50254, 2013 WL 159246, at *2 (N.D. Ill. Jan. 15, 2013); *Monday v. Oullette*, 118 F.3d 1099, 1101 (6th Cir. 1997); *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 308 (S.D.N.Y. 1998)). The district court appears to have done this research on its own, as none of the cases it cites are in defendants' motion for summary judgment. *Id.*; *see also* R. 20 (Mot. for Summ. J.) (Page ID #46); R. 27 (Mem. in support of Mot. for Summ. J.) (Page ID #134).

In appealing the district court's decision, Pennington maintains that he was not actively resisting and adds that Harris cannot claim that he tasered Pennington in order to preserve evidence or prevent an overdose because Harris had already inspected Pennington's mouth—an addition that makes perfect sense given the district court's development of defendants' assertions. Appellant Br. at 17–24. Pennington's argument, therefore, is not an issue raised for the first time on appeal. It an expansion of Pennington's earlier argument and a response to the district court's opinion.

Even if Pennington's argument is an issue raised for the first time on appeal, it merits an exception. First, considering Pennington's argument does not unfairly prejudice defendants, as the argument is not an "unfair surprise[]." *See Allstate Ins. Co. v. Glob. Med. Billing, Inc.*, 520 F. App'x 409, 412 (6th Cir. 2013). Defendants had the videotape in their possession, and the videotape includes the following exchanges which all occur *before* Harris allegedly tasers Pennington:

>Pennington: I ain't got no evidence.
>Harris: I know you don't. It's in your belly now.

R. 29 (Videotape at 3:34–3:36) (Page ID #167).

>Harris: You just swallowed it then!

*Id.* at 4:00–4:02.

>Long: It's [referring to residue] right there on your teeth.

*Id.* at 4:04–4:06. Defendants also acknowledged in their motion for summary judgment that the officers searched Pennington's mouth shortly after handcuffing him:

>Officer Long and Sergeant Harris then took Mr. Pennington to the ground where Officer Long handcuffed Pennington's hands behind his back. Sergeant Harris continued to examine Pennington's mouth for evidence of the narcotic drugs which he had seen him put in his mouth. One pill was spit out. Another pill may have been found on the ground where Pennington dropped it. Sergeant Harris turned Pennington over and examined his mouth to determine if any more pills remained in his mouth.

R. 27 (Mem. in support of Mot. for Summ. J. at 3) (Page ID #136).

Second, the majority's assertion that the general rule against considering newly raised issues "applies with even greater force when the issue 'necessitates a determination of the facts'" makes the same error as its summary-judgment analysis. Maj. Op. at 15. In a qualified-immunity inquiry, the court takes the facts "in the light most favorable to the party asserting the injury." *See Scott*, 550 U.S. at 377. "At the summary judgment stage, . . . once we have determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, . . . the reasonableness of [the defendants'] actions . . . is a pure question of law." *Id.* at 381 n.8 (emphasis removed). Thus, there is no need for a factual determination. With no prejudice to defendants or factual determination required, an exception to the general rule is warranted.

Accordingly, I would conclude that Pennington's argument is not waived and that therefore the questions before the court are whether Pennington had a clearly established right not to be tasered while handcuffed and complying, and whether the officers violated that right. Given our case law on the subject, as well as our obligation to take the facts in the light most favorable to the party asserting the injury, I would answer yes to both questions. *See, e.g.*, *Thomas v. Plummer*, 489 F. App'x 116, 127–29 (6th Cir. 2012); *Kijowski v. City of Niles*, 372 F. App'x 595, 600–01 (6th Cir. 2010); *Landis v. Baker*, 297 F. App'x 453, 461–64 (6th Cir. 2008). The majority seeing this differently, I respectfully dissent.