NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0446n.06

No. 14-1771

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LABEED NOURI, Individually, and as Next Friend to Hakam Nouri, Jacob Nouri, Sami Nouri, Maria Nouri, minors, and Rowaida Nouri | ) ) ) ) | |
| Plaintiff-Appellant, | ) ) | **FILED**<br>Jun 12, 2015<br>DEBORAH S. HUNT, Clerk |
| v. | ) ) | |
| COUNTY OF OAKLAND; MICHAEL BOUCHARD, Sheriff; CHRIS MILLER, Sergeant; DEPUTY KARSEN; DEPUTY HEIN; JAMES GREGORY, Deputy; HALA JARBOU; HAZEL PARK POLICE DEPARTMENT; JASON WEIMER, | ) ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendants-Appellees, | ) ) ) | |
| and | ) ) | OPINION |
| OAKLAND COUNTY JAIL, et al., | ) ) | |
| Defendants. | ) ) ) | |

**BEFORE:** GIBBONS, SUTTON, and MCKEAGUE, Circuit Judges.

**JULIA SMITH GIBBONS, Circuit Judge.** Dr. Labeed Nouri was convicted by a Michigan jury of sexually assaulting an employee of his medical practice, but he was eventually released under the terms of a plea agreement after evidence of juror misconduct. He sued the prosecutor, Hala Jarbou, the lead detective, Lieutenant Jason Weimer, and the Hazel Park Police Department for supposed improprieties in the investigation and prosecution. He also sued

Sheriff Michael Bouchard, Oakland County, and several other Oakland County employees who he claimed violated his constitutional rights while a pretrial detainee and prisoner. The district court dismissed all of his claims on Rule 12(b)(6) motions or motions for summary judgment. He appeals the dismissal of a significant subset of those claims, but we affirm.

## I.

On June 22, 2007, an 18-year-old employee of Nouri's orthopedic surgery practice, Krystal Kirma, entered a local hospital claiming to have been sexually assaulted while alone with Nouri in his office. That same day she spoke with an officer of the Hazel Park Police Department. In her account to the police, she claimed that she had asked Nouri to examine her back, but that Nouri held her down and groped her while she lay on the examination table. (*Id.*) He then let her go, and she checked into the hospital after telling her mother and boyfriend of the incident.

The Hazel Park Police Department assigned Weimer to investigate the case. He retrieved the "rape kit" from the local hospital. Weimer quickly interviewed Kirma, explaining the seriousness of her allegations and that she herself could be prosecuted if found to have fabricated the event. Kirma gave an account to Weimer similar to her first statement to the police. Weimer then interviewed Kirma's mother, Kirma's father, and other employees of Nouri's medical practice and had Kirma and her mother provide written statements. He interviewed Kirma further to see if she could recall certain details of the assault and to ascertain how she could recall some of those details. Weimer next interviewed Kirma's boyfriend, who claimed in person and in a later statement that Kirma had come to him noticeably upset on the day of the alleged assault. On June 6, 2007, Weimer set up a "one party consent call" in which he had

Kirma call Nouri to discuss the alleged assault while he listened. Nouri denied the allegations during that call.

Weimer interviewed Nouri himself on June 17, 2007. Nouri again denied Kirma's allegations; he claimed that he was taking dictation and conversing on the phone at the approximate time of the alleged assault. According to Nouri, these dictations were stored with an off-site third-party and were time-stamped. Nouri suggested that Kirma may harbor animus toward him and others of Chaldean ethnicity or may be trying to set him up. Notably, he also told Weimer that he had not spoken to Kirma about the event. Nouri had another interview with Weimer two days later in which he brought four dictation tapes with time stamps. By the end of July, Weimer obtained Nouri's dictation and phone logs, going so far as to discuss the time stamps with the CEO of the dictation company. Weimer talked to Nouri, Kirma, and Kirma's parents again several times throughout July and early August. In mid-August, he proceeded to discuss some of the medical evidence of injury with Kirma's gynecologist.

Around this time Weimer turned over his case file to the Oakland County prosecutor, which sought and received an arrest warrant. Weimer and others testified at trial. On May 8, 2008, Nouri was convicted of one count of first-degree criminal sexual conduct and two counts of fourth-degree criminal sexual conduct.

On some basis that the record does not make entirely clear, it became apparent that juror misconduct may have occurred.[1] The parties stipulated to a new trial, and the state court entered an order granting that trial and vacating the criminal sexual conduct convictions. But Nouri was still in jail at this point, and rather than remain in jail waiting for that trial he signed an agreement with the government in which he pled no contest to a single count of aggravated

---

[1] Nouri also alleges that Kirma's boyfriend lied on the stand, but the record before us does not substantiate this claim.

assault in exchange for dismissal of the more serious sexual assault charges and an immediate release from prison. As part of the deal, he also signed a stipulation "that at a trial . . . the People would produce evidence, if believed by the finder of fact, that would establish that [he] touched Krystal Kirma without her consent and that the unconsented touching resulted in an injury sufficient to satisfy the injury element" of the aggravated assault statute. The state court approved the plea and sentence agreement in April 2011, nearly three years after his conviction.

For most of that three-year period Nouri had been confined to the Oakland County Jail. Nouri claims that, while in the jail, he was repeatedly attacked by other inmates and sustained serious, lasting injuries to his mouth and head. According to Nouri, the prison guards and medical staff compounded these injuries either by denying him critical treatment altogether or by withdrawing medical care to punish him for perceived slights. He did not receive treatment for some of his injuries until after his release.

Nouri received several citations from jail staff for infractions of jail ordinances. Some involved possession of contraband, and others involved more serious altercations that required him to be placed into a different area of the prison. The jail deemed Nouri a "high security" inmate after these infractions, which meant that he had to seek special approval to receive visits from anyone under the age of 18. As a result Nouri received only one visit from his children but received numerous visits from his wife.

Nouri filed a *pro se* complaint while still an inmate, but for the purposes of this appeal the more important event is the filing of his amended complaint after his release (now aided by counsel). In this pleading Nouri asserted a variety of constitutional and state claims. He alleged that Oakland County and Sheriff Bouchard violated his rights under the First, Eighth, and Fourteenth Amendments to the Federal Constitution by depriving him of necessary medical care

and by denying him visitation rights with his children. The district court dismissed the medical care claim upon a 12(b)(6) motion and the visitation claim upon summary judgment. Against Weimer and the prosectuor, Hala Jarbou, Nouri asserted several claims under the Fourth and Fourteenth Amendments. The district court dismissed the claims against Jarbou at the pleading stage on grounds of prosecutorial immunity. The claims against Weimer were ultimately dismissed at summary judgment. We provide further discussion of the procedural history for each claim as necessary below, but we also note now that Nouri amended his complaint a second time after the partially successful Rule 12 motion. Nouri appeals each of the claims discussed above.

## II.

We review *de novo* the dismissal of a claim under Fed. R. Civ. P. 12(b)(6). *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). "In assessing a motion to dismiss under Rule 12(b)(6), this court construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 403 (6th Cir. 2012) (alteration in original) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).

We also review a grant of summary judgment *de novo. Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). Summary judgment is appropriate where the evidence on record shows no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party can first demonstrate to the court that an essential element of the nonmoving party's case is absent; upon that showing the non-moving party must present sufficient evidence to demonstrate that there is a factual

controversy as to that element, or at least explain why such evidence is not available. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). We grant all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986). But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

### III.

"To state a claim under [42 U.S.C.] § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). We first consider Nouri's claim against Oakland County and Sheriff Bouchard in his official capacity for denial of medical care under the Eighth and Fourteenth Amendments. The district court dismissed that claim upon a Rule 12(b)(6) motion, ruling that Nouri had not alleged municipal or supervisory liability under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

The first amended complaint is not clear whether it seeks to hold Sheriff Bouchard liable in his official or individual capacity, but Bouchard asserted qualified immunity as a defense, which suggests that he had fair notice of individual liability under this circuit's "course of proceedings" test. *See Moore v. City of Harriman*, 272 F.3d 769, 772 n.1 (6th Cir. 2001) (en banc). We therefore address the individual liability component as well.

### A.

"The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious

medical needs." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The Due Process Clause of the Fourteenth

Amendment provides similar protections to pretrial detainees. *Id.* (citing *Bell v. Wolfish*,

441 U.S. 520, 545 (1979)). Under either amendment, the plaintiff must prove both objective and

subjective culpability. *See, e.g.*, *Blackmore*, 390 F.3d at 895. Nouri's first amended complaint is

the operative pleading here. Reading the complaint generously, his allegations could satisfy both

components of his claim. But even though Nouri alleges plausible constitutional violations by

his guards, he does not sufficiently allege that these actions were as a direct result of the

County's policy or custom. *See Monell*, 436 U.S. at 694. "A plaintiff can make a showing of an

illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal

official policy or legislative enactment; (2) that an official with final decision making authority

ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or

(4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess

v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Nouri relies primarily on *Leach v. Shelby County

Sheriff*, 891 F.2d 1241 (6th Cir. 1989), to support his theory of municipal liability. Although the

*Leach* court couched its analysis in terms of an illicit policy, we have since categorized its facts

as an example of a custom of tolerance or acquiescence. *See Burgess*, 735 F.3d at 478. We

therefore construe his arguments in that fashion.

Where, as in this case, a plaintiff asserts a custom of *inaction* towards constitutional

violations, we have required plaintiffs to show (1) a "clear and persistent pattern" of misconduct,

(2) notice or constructive notice on the part of the municipality, (3) the defendant's tacit approval

of the misconduct, and (4) a direct causal link to the violations. *See Powers v. Hamilton Cnty.

Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (citing, among other cases, *Doe v.*

*Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).  Nouri's complaint is fatally deficient on

at least the first and second elements; it simply does not set forth any facts that suggest the

Sheriff or County had notice of recurring violations, or even the mistreatment of Nouri himself.

*Leach* is not to the contrary.  In that case we upheld a finding of constructive notice, and

ultimately a custom of deliberate indifference, based on the indisputable mistreatment of at least

fourteen paraplegic inmates.  *See Leach*, 891 F.2d at 1247–48.  But we have never found notice

of a pattern of misconduct (or the pattern itself) solely from the mistreatment of the plaintiff.

*See, e.g.*, *Garretson v. City of Madison Heights*, 407 F.3d 789, 795–96 (6th Cir. 2005).  To do so

risks "collapsing . . . the municipal liability standard into a simple *respondeat superior* standard."

*Thomas v. City of Chattanooga*, 398 F.3d 426, 432–33 (6th Cir. 2005).  Here, Nouri provides "no

[allegations] of any similar incidents" involving other inmates or "that any such incidents were

ever reported to the current, or any former, Sheriff."  *Shorts v. Bartholomew*, 255 F. App'x 46,

58 (6th Cir. 2007).  He has only his own experience on which to rely, and that is not enough to

state a claim against the County.

## B.

The first amended complaint also fails to state a claim that Bouchard is individually liable

for any constitutional violations.  As the Supreme Court reminded lower courts in *Iqbal*, "[i]n a

§ 1983 suit . . . each Government official, his or her title notwithstanding, is only liable for his or

her own misconduct."  556 U.S. at 677.  This court has refused to find a sheriff individually

liable for a deliberate indifference claim where the plaintiff could not show that the sheriff had

any knowledge of the harm to the plaintiff potentially caused by his own inaction.  *See Shorts*,

255 F. App'x at 55.  And the court so held even though the sheriff had a statutory duty to care for

the county's prisoners.  *See id.* at 59.  Nouri's first amended complaint asserts no facts

suggesting that Bouchard himself had such knowledge, and thus Bouchard cannot be held personally liable for deprivation of necessary medical care.

## IV.

Next in his first amended complaint, Nouri alleged an "unconstitutional denial of visitation of [his] minor children" while in custody. Unlike his medical care count, Nouri did not specify a defendant for this claim. When Bouchard, the County, Jarbou, and other defendants moved to dismiss the claims against them in the first amended complaint, they argued that the visitation claim should be dismissed for failure to specify a defendant, the capacity in which any defendants were being sued, and whether the claim rested on state or federal law. The district court found these arguments persuasive and dismissed the claim with prejudice.

Nouri quickly moved the court to reconsider its dismissal of the visitation claim (as well as the dismissal of his other claims), asking for permission to correct any deficiencies through amendment. The court granted him permission to amend his complaint solely "to clarify who [his] denial of visitation claim" targets. Nouri used that opportunity to name Bouchard and the County as defendants and also added greater specificity to his allegations that he was denied visitation rights in violation of the Eighth and Fourteenth Amendments. An answer was filed (the details of which are a major point of dispute), and both parties eventually moved for summary judgment on the visitation claim. The district court granted summary judgment to the defendants.

## A.

Nouri first assails summary judgment by arguing that Bouchard and Oakland County admitted to this claim. He specifically contends that the answer to his second amended complaint does not deny the allegations supporting the visitation claim and that, as a result, those

allegations should be deemed admitted. The district court rejected this argument without any supporting legal citation in its order granting summary judgment.

That conclusion was ultimately correct. We consider the visitation allegations denied for two reasons. First, the Third Circuit has refused to find an admission to a later amended complaint, despite no responsive pleading, where the defendant denied "substantially the same" allegations in its answer to the original complaint. *See LaGorga v. Kroger Co.*, 407 F.2d 671, 673 (3d Cir. 1969). Here, Bouchard and the County denied allegations supporting the visitation claim in their responsive pleading to the first amended complaint. And those allegations are substantially similar to those in the second amended complaint, although the former are much more general.

Second, these defendants effectively denied the allegations supporting the visitation claim elsewhere in their pleading. "[W]hen a defendant labels a specific denial as an affirmative defense, the proper remedy is . . . to treat it as a denial." *Adams v. Jumpstart Wireless Corp.*, 294 F.R.D. 668, 671 (S.D. Fla. 2013) (citing 5 Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1269 (3d ed. 2014)); *see also N.Y. Life Ins. Co. v. Gamer*, 303 U.S. 161, 166 (1938) (treating a mislabeled affirmative defense as a specific denial). In the "Affirmative Defenses" section of their answer to the second amended complaint, Bouchard and the County asserted in paragraph 12 that "Plaintiffs' civil and/or constitutional rights have not been violated." Two paragraphs later they aver that they did not "adopt any customs, policies and/or procedures which caused or otherwise were the moving force behind any constitutional violations alleged in Plaintiffs' Complaint[.]" These statements gave Nouri "plain notice" that the visitation claim would be contested, and he should therefore "be put to his proof" on this claim "irrespective of any error by the defendant regarding terminology." 5 Wright & Miller et

al., *supra*, § 1269.  This is the best construction of the pleadings "so as to do justice."  Fed. R. Civ. P. 8(e).

**B.**

On the merits of the visitation claim, the district court held that Nouri could show no triable issue of fact on his visitation claim under the framework articulated by the Supreme Court in *Overton v. Bazzetta*, 539 U.S. 126 (2003).  *Overton* upheld two Michigan Department of Corrections policies restricting non-contact visits to inmates against challenges arising under the First, Eighth, and Fourteenth Amendments.  539 U.S. at 130.  The first policy barred visits from minors who were not the children, stepchildren, grandchildren, or siblings of an inmate.  *See id.* at 129.  The second policy denied an inmate all visitors besides attorneys and clergy if that inmate committed multiple substance abuse violations.  *See id.* at 130.  The Court first noted that "[t]he very object of imprisonment is confinement" and that consequently "[m]any of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner."  *Id.* at 131.  This principle applied especially to the "freedom of association[,]" which "is among the rights least compatible with incarceration."  *Id.*  Drawing on *Turner v. Safley*, 482 U.S. 78, 89–91 (1987), the Court identified four factors relevant to assessing the constitutionality of a prison regulation on inmate visitors:

> [1] whether the regulation has a valid, rational connection to a legitimate governmental interest; [2] whether alternative means are open to inmates to exercise the asserted right; [3] what impact an accommodation of the right would have on guards and inmates and prison resources; and [4] whether there are ready alternatives to the regulation.

*Overton*, 539 U.S. at 132 (quoting *Turner*, 482 U.S. at 89–91).  The Court placed the burden of proving the unconstitutionality of a regulation on the prisoner, not the government.  *Id.* at 132.

The record forecloses Nouri's visitation claim under this framework. The jail policy at issue barred visits by minors to inmates classified as "high security" without special permission from jail staff. Nouri had been classified as "high security" due to a significant number of jail ordinance violations across his two years in the jail, which the district court thoroughly catalogued. During this period, Nouri was allowed only one non-contact visit with one of his children, but received numerous visits from his wife.

Applying the *Overton/Turner* factors, we conclude that the restriction on visits to high security inmates has a rational relation to a legitimate penological interest. Bouchard and the County submitted affidavits from the jail's managers that the restrictions on child visits to high security inmates served at least two purposes: the "maintenance of internal security" and the "protection of minor visitors from intentional or accidental injury within the" jail. The *Overton* Court held both of these factors to be legitimate interests of a prison, *see* 539 U.S. at 133, and a restriction on visitation to the most troublesome inmates bears an especially strong relationship to these purposes, *see id.* at 134, 136–37. Similarly, Nouri had an alternative means of communicating to his children by relaying messages through his wife, a practice also explicitly blessed by the Court in *Overton*. *See id.* at 135 (citing *Pell v. Procunier*, 417 U.S. 817, 825 (1974)). As to the third factor, the impact on jail staff and prison resources is obvious to the extent that the policy promotes internal security and prevents disruptions between inmates. Finally, Nouri does not even suggest an "obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost" to the jail. *Id.* at 136. At most, he points to an admission by the County that "Oakland County Jail . . . has the technology available at the relevant facility . . . to conduct 'non-contact' or 'no-contact' visits between

visitors and inmates." But that was already obvious from Nouri's one non-contact visit with his child, and it only returns us to the question of what restrictions on such visits are appropriate.

Nouri does not contest the application of these factors so much as argue that the *Overton/Turner* framework is inapplicable to his case. He first contends that the Oakland County Jail had a "*de facto* permanent ban on all visitation for certain inmates," which the *Overton* Court suggested might be impermissible. *See id.* at 134. This argument ignores the fact that Nouri had at least one visit with his daughter and multiple visits from his wife.[2] Moreover, it fails to recognize that the jail's policy of "[w]ithdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, *especially for high-security prisoners* who have few other privileges to lose." *Id.* (emphasis added). Lastly, Nouri argues that *Overton* does not apply to restrictions on visits to pretrial detainees (as opposed to inmates), citing repeatedly *O'Bryan v. Saginaw County*, 437 F. Supp. 582 (E.D. Mich. 1977). Whatever the merits of that opinion, it does not control this case; the Supreme Court has applied the same rational basis review to limitations on visits to pretrial detainees. *See Block v. Rutherford*, 468 U.S. 576, 585–89 (1984) ("It is no answer . . . that we deal here with restrictions on pretrial detainees rather than convicted criminals.") (citing *Bell v. Wolfish*, 441 U.S. 520, 546 n.28 (1979)).

In sum, Nouri cannot hope to meet his burden under *Overton* now or at trial, and the district court therefore did not err in granting summary judgment on his visitation claim.

---

[2] Nouri also points to a recent version of the Oakland County Jail's website as evidence that the County bans all visits from minors. This screenshot clearly displays a date several years after Nouri's incarceration and thus does not speak to the jail policy relevant to this case. Additionally, this new policy is clearly explained elsewhere in the record as a recent development that post-dates Nouri's time in the jail. We have no occasion in this case to pass on its constitutionality.

**V.**

In his first amended complaint, Nouri asserted claims against Lieutenant Weimer and the Hazel Park Police Department for violation of his rights under the Fourth and Fourteenth Amendments. The district court dismissed the claim against the Department for failure to allege a policy or custom supporting municipal liability under *Monell*. The court subsequently granted summary judgment to Weimer because it found no genuine dispute that Kirma's firsthand account gave him probable cause to investigate Nouri and that he did not do so in such a manner as to violate substantive due process.

We first note that Nouri's constitutional claim against the Hazel Park Police Department is best construed as a claim against the municipality of Hazel Park. *See Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 991–92 n.1 (6th Cir. 1994). We can quickly affirm dismissal of that claim since Nouri's first amended complaint fails to allege any facts supporting a policy or custom of constitutional violations by Hazel Park. A single constitutional violation by Weimer would not itself support municipal liability. *See, e.g.*, *Thomas*, 398 F.3d at 432.

Nouri also asserted the same constitutional claim against Weimer in his personal capacity. Since the relevant part of the complaint recites the elements of a malicious prosecution claim under § 1983, we construe it as such. Those elements are as follows: (1) that the defendant made, influenced, or participated in a decision to prosecute the plaintiff, (2) that a prosecution against the plaintiff began, (3) that the prosecution lacked probable cause, (4) that the plaintiff was deprived of his liberty, and (5) that the criminal proceeding was resolved in favor of the plaintiff. *See Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010). We affirm summary judgment for Weimer on this last requirement.[3]

---

[3] Although the district court did not address this element in its grant of summary judgment, we may affirm on other grounds. *See, e.g.*, *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 456 n.2 (6th Cir. 2008).

Even though the criminal sexual conduct convictions were vacated as part of the stipulation to a new trial, "the reversal of a conviction and remand for a new trial does not" alone constitute a termination of the proceedings, much less one conclusively establishing Nouri's innocence. *DiBlasio v. City of New York*, 102 F.3d 654, 658 (2d Cir. 1996). Instead, those convictions were dismissed as part of Nouri's plea deal with the state, and courts do not consider that sort of compromise to be sufficiently favorable to the criminal defendant to support a malicious prosecution claim. *See Ohnemus v. Thompson*, 594 F. App'x 864, 867 (6th Cir. 2014) (citing Restatement (Second) of Torts § 658 cmt. c (1977)); *Wilkins v. DeReyes*, 528 F.3d 790, 802–03 (10th Cir. 2008); *Jones v. City of Boston*, 135 F. App'x 439, 440 (1st Cir. 2005); *Uboh v. Reno*, 141 F.3d 1000, 1004–05 (11th Cir. 1998); Dan B. Dobbs et al., *The Law of Torts* § 590 (2d ed. 2011). And to the extent that Nouri alleges that Weimer perjured himself on the stand as part of his malicious prosecution claim, we note that absolute testimonial immunity bars recovery. *Briscoe v. LaHue*, 460 U.S. 325, 345 (1983).

## VI.

We come last to Nouri's claims against Jarbou. In his first amended complaint, Nouri alleged a wide variety of claims against Jarbou for her role as prosecutor in his conviction; these claims included violations of the Fourth and Fourteenth Amendments for false arrest and false imprisonment, conspiracy to violate Nouri's civil rights, malicious prosecution, and abuse of process. Jarbou moved to dismiss all of these claims as barred by absolute prosecutorial immunity, which the district court granted in full. On appeal, Nouri contends in cursory fashion

that Jarbou should not enjoy immunity against his federal claims.[4] (His contention does not persuade us.

"A claim of prosecutorial immunity may be asserted in a Rule 12(b)(6) motion to dismiss." *Barr v. Gee*, 437 F. App'x 865, 876 (11th Cir. 2011) (per curiam). "Generally, prosecutors are immune from liability under § 1983 for prosecutorial functions intimately associated with initiating or presenting the State's case." *Drake v. Howland*, 463 F. App'x 523, 525 (6th Cir. 2012) (citing *Imbler v. Pachtman*, 424 U.S. 409, 427–28 (1976)). "But absolute immunity does not shelter a prosecutor's conduct unrelated to advocacy[,]" particularly acts deemed "investigative or administrative, rather than prosecutorial[.]" *Id.* (internal quotation marks omitted) (citing *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–43 (2009); *Burns v. Reed*, 500 U.S. 478, 492 (1991)).

Here, each one of Nouri's § 1983 claims against Jarbou stems from the core activity protected by absolute immunity—"initiating a prosecution and in presenting the State's case[.]" *Imbler*, 424 U.S. at 431. His complaint is largely devoid of non-conclusory allegations concerning Jarbou's actions; Nouri at best suggests that Jarbou's decision to prosecute was driven by prejudice against Chaldean men. But these allegations are "of no consequence, for absolute immunity provides complete protection from judicial scrutiny of the motives for the prosecutor['s] actions." *Ireland v. Tunis*, 113 F.3d 1435, 1447 (6th Cir. 1997); *see also Forrester v. White*, 484 U.S. 219, 227 (1988) (noting that, for purposes of judicial immunity, an act "does not become less judicial by virtue of an allegation of malice or corruption of motive"). Finally, Nouri attempts to evade absolute immunity by claiming before this court that Jarbou in fact engaged in investigative activities outside the prosecutorial function. But he did not allege

---

[4] In addition to his claims under 42 U.S.C. § 1983, Nouri asserted other state law claims against Jarbou. The district court dismissed these claims as barred by immunity doctrines arising out of state law. Nouri does not contest the dismissal of those claims before this court.

those actions in his first amended complaint, and the district court properly ignored this argument when dismissing his § 1983 claims against Jarbou. *See Barr,* 437 F. App'x at 876.

**VII.**

We affirm the judgment of the district court.