NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0599n.06

No. 20-5194

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Oct 21, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PHILLIP ROBERTS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| COFFEE COUNTY, TENNESSEE; JOHN | ) | DISTRICT OF TENNESSEE |
| CARROLL; CHASE STRANGE; DAKOTA | ) | |
| LILES, | ) | |
| | ) | |
| Defendants-Appellees. | | |

BEFORE: COLE, Chief Judge; McKEAGUE and WHITE, Circuit Judges.

HELENE N. WHITE, Circuit Judge. Plaintiff-Appellant Phillip Roberts appeals the grant of summary judgment to Defendants-Appellees Coffee County, John Carroll, Chase Strange, and Dakota Liles, arguing that he presented sufficient evidence of genuine disputes of material fact about whether Carroll and Strange were deliberately indifferent to his safety, Liles used excessive force against him, and Coffee County had a pattern of tolerating constitutional violations and inadequate supervision. Because Roberts presented a genuine dispute of material fact about whether Carroll, Strange, and Liles violated his constitutional rights, we REVERSE the grant of summary judgment to Carroll and Liles and REVERSE IN PART with regard to Strange. Roberts's claim against Coffee County, however, lacks a sufficient evidentiary basis, and we therefore AFFIRM the grant of summary judgment to the County.

**I.[1]**

Roberts was booked as a pretrial detainee into the Coffee County Jail in May 2017. Upon arrival, he was assigned to a cell in AD pod. Roberts complained to the classifications sergeant, Carroll, about being assigned to AD pod, warning that he would have a problem because there were informants in AD pod who had tried to set him up. On May 11, Roberts was attacked by multiple inmates in AD pod. Roberts had smuggled tobacco into the jail and smoked cigarettes after lockdown the night before, and the inmates smelled it and concluded that Roberts was the one smoking tobacco. The inmates approached Roberts in his cell, asked Roberts for the tobacco, and when he refused, they kicked and punched Roberts for several minutes, resulting in a black eye, cut lip, and several bruises. Roberts asserts he informed Strange of the attack and asked for a transfer; asked other guards to convey his request for a transfer to Carroll; and also entered complaints and requested medical attention through the prison kiosk system. Roberts did not tell the officers about the contraband. Roberts remained in AD pod and continued possess the tobacco, and the inmates who had attacked him continued to threaten him.

Four days later, Roberts was attacked in his cell again by some of the same inmates for refusing to give them his tobacco. Strange was on duty in the tower during the attack and was supposed to be watching over the pod. Roberts claims he spoke with guards about the attack and asked them to convey to Carroll his request for a transfer, and that he also wrote kiosk requests to be transferred. Still, he was not transferred out of AD pod.

A week later, on May 22, Roberts was attacked again by some of the same inmates. Roberts complained about the attacks again and was moved to a different pod three days later, on May 25. A jail record states: "MOVED PER CLASSIFICATIONS INMATE CANT [sic] LIVE IN ANY

---

[1] Because we are reviewing the grant of summary judgment to Defendants, the facts recited here are presented in the light most favorable to Roberts unless otherwise noted.

POD WHILE IN AD[.] INMATE HAD ALTERCATION WITH OTHER INMATES[.] 4462 JC[.] FOR HIS PROTECTION DO NOT MOVE UNLESS CLASSIFICATION KNOWS." R. 56-3, PID 241. Despite his claims that he made repeated complaints and requests for a transfer, no other jail documentation exists to support Roberts's testimony that he made complaints and requests for a transfer to the guards and through the kiosk system prior to his transfer. Carroll and Strange testified that they had no knowledge that Roberts was assaulted or that he had requested a transfer for his safety, and that if he had made such a request, it would have been documented.

The jail records reflect that on June 1, Roberts submitted a grievance stating that he had been assaulted while in AD pod, and he also requested medical assistance. Roberts submitted additional grievances regarding the assaults over the next three days. Roberts saw Nurse Practitioner Lynn Carter (NP Carter) on June 7 and complained that he could hardly walk, had broken ribs and a broken pelvis, and had knee, back, and ear pain. NP Carter's notes indicate that she found Roberts to have full range of motion in his back and knees, and no bruising, broken bones, deformity, or redness on his ears. NP Carter wrote down that Roberts was "malingering," but she prescribed him Naproxen, a medication for pain and swelling.

Roberts testified that on June 9, he asked a guard, Liles, if he could have another inmate's food, which was approved. When Liles came to Roberts's cell, Roberts stuck his arm through the metal pie flap or hatch through which trays are ordinarily passed for food distribution. Liles then slammed the hatch on Roberts's arm and held it there for fifteen to twenty seconds. Roberts thinks he tore his rotator cuff and still has pain from this incident but did not seek medical treatment. Liles denies that any such incident occurred.

According to Chief Deputy Watkins, AD pod "is not known to have any pervasive issues with inmate on inmate assaults," R. 49-4, PID 148; and Carroll testified that Roberts's intake

assessment did not suggest that Roberts needed protective custody or was at a higher risk of assault. Watkins testified that classification officers receive training about inmate classification and make their determinations based on a variety of factors, including current and past convictions, current and past institutional behavior, pending charges in other jurisdictions, and any other information bearing on the safety and security of the facility. All corrections officers are trained on how to handle inmate requests to be moved within the jail. They determine the validity of any expressed concern and the feasibility of a requested transfer. Requests for a transfer made to an officer should be documented and passed on to an officer with authority to make the transfer, i.e., a shift lead or classifications officer. Coffee County Jail has a policy and practice of transferring inmates known to be in danger of assault. The kiosk system is managed and maintained by an outside company, and nobody at the Jail can delete or manipulate inmate kiosk entries.

Roberts filed his one-count complaint under 42 U.S.C. § 1983 against Coffee County, Carroll, Strange, and Liles, alleging a violation of his Fourteenth Amendment right to be free from punishment without due process of law. The parties consented to a magistrate judge conducting the proceedings pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. Defendants moved for and were granted summary judgment. The magistrate judge concluded that Defendants were not liable for initially assigning Roberts to AD pod because Roberts's general concerns about being housed with informants was insufficient for the guards to perceive a substantial risk of harm, and because Roberts was not attacked based on any issues with informants but rather because he smuggled tobacco into the jail.

As to the second and third assaults, the magistrate judge reasoned that there was no "corroborating proof" that the incidents occurred as alleged and that the transfer of Roberts to a different pod "negates his argument of deliberate indifference." R. 60, PID 354. Further, the

magistrate judge rejected the claim against Strange for allegedly observing Roberts being assaulted and doing nothing to protect him because there was insufficient evidence that Strange actually witnessed the assault. As to the excessive-force claim against Liles, the magistrate judge found insufficient proof that the incident happened because "Plaintiff did not seek or receive medical treatment for the alleged injury, and there are no records or recordings supporting that the June 9, 2017, incident ever occurred." *Id.* at PID 355.

The magistrate judge also dismissed the claim against the County because (1) Roberts had failed to establish an underlying constitutional violation; (2) no County policy or custom caused the assaults on Roberts; and (3) the alleged assaults on other inmates were too few and dissimilar to support a failure-to-supervise theory.

Finally, as additional, independent reasons for granting summary judgment, the magistrate judge reasoned that the claim regarding inmate assaults failed for lack of causation because Roberts's injuries were caused by his own actions of smuggling tobacco into the jail, and his claim against all Defendants failed because the evidence established nothing more than de minimis injuries.

Roberts now appeals.

## II.

We review de novo a grant of summary judgment, viewing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party. *Kent v. Oakland County*, 810 F.3d 384, 390 (6th Cir. 2016). Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

**A.**

We first address Roberts's claim against Strange and Carroll for their alleged deliberate indifference to Roberts's safety in failing to protect him from harm. As a pretrial detainee, Roberts's claim is governed by the Fourteenth Amendment's substantive due process clause, which we generally analyze the same as claims under the Eighth Amendment. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013).[2] To recover under 42 U.S.C. § 1983, Roberts must show the deprivation of a constitutional right caused by someone acting under color of state law. *Miller v. Calhoun County*, 408 F.3d 803, 811-12 (6th Cir. 2005). There is no dispute that Defendants were acting under color of state law.

Carroll and Strange argue that they are protected by qualified immunity. To rebut a qualified-immunity defense, Roberts must show that Carroll and Strange violated his constitutional right and that the unconstitutionality of their conduct was clearly established when they acted. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). The magistrate judge granted summary judgment only on the basis that Carroll and Strange had not violated Roberts's constitutional rights, and the parties confined their briefing to that issue below and on appeal. Accordingly, we do not address whether the rights Carroll and Strange allegedly violated were clearly established.[3]

To succeed on his claim for deliberate indifference to an inmate's safety, Roberts must make a two-part showing that (1) the risk of harm was objectively sufficiently serious; and (2) the defendants were deliberately indifferent to the risk to his safety. *Farmer v. Brennan*, 511 U.S. 828, 834 (1994). An official is deliberately indifferent if he "knows of and disregards an excessive

---

[2] Although we recently noted that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), "calls into serious doubt" whether a subjective-intent requirement applies to a deliberate-indifference claim by a pretrial detainee under the Fourteenth Amendment, because neither party discusses *Kingsley*'s potential effect on Roberts's deliberate-indifference claim, we do not address that issue here. *Richmond v. Huq*, 885 F.3d 928, 938 n.3 (6th Cir. 2018).

[3] The same is true for the claim against Liles, discussed *infra*.

risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* at 837.

The magistrate judge addressed whether Carroll and Strange were deliberately indifferent based on the initial placement of Roberts in AD pod. On appeal, Roberts suggests that this was never part of his claim because it "is not even specifically listed in the Complaint" and contends that "the real gravity of the claims is that the guards . . . refused to move the Plaintiff *even after he was attacked*." Appellant's Br. at 19. Given this concession, we do not address such a claim.

As for the subsequent assaults, Carroll and Strange argue that summary judgment was appropriately granted because there are no jail or medical records corroborating the alleged assaults or Roberts's claimed injuries, which is "simply impossible" if the events occurred as Roberts describes. Appellees' Br. at 26. Carroll and Strange point out that Watkins testified that had Roberts reported the assaults to guards or through the kiosk system, there would be records of the incidents because jail personnel cannot delete kiosk entries, and jail staff with knowledge of an event create an incident report. However, neither side's evidence is conclusive, so this argument simply raises a credibility question—whether Roberts was telling the truth when he testified that he made numerous reports about the incidents, or whether Watkins's assurances are correct that records of the events would still exist today if the events occurred as Roberts says. Further, although Carroll denies having knowledge of any threats to or assaults on Roberts, the one jail record of the assault was apparently made by Carroll and states that Roberts had an "altercation" with other inmates and was moved for his protection, which calls into question the reliability of Carroll's testimony. Additionally, although NP Carter's testimony and Roberts's medical records suggest that Roberts's description of his injuries was exaggerated—it seems unlikely, for example,

that he suffered broken ribs, *see Booher ex rel. T.W. v. Montavon*, 555 F. App'x 479, 484 (6th Cir. 2014) (relying on objective medical evidence that blatantly contradicted the plaintiff's version of events)—the evidence does not definitively establish that Roberts was not assaulted by inmates. The medical evidence's definitiveness, for example, is diminished by the fact that NP Carter did not examine Roberts until seventeen days after the final alleged assault.

Although some of the evidence proffered by Defendants is inconsistent with Roberts's testimony, Roberts's version of events is not blatantly contradicted by the record such that no reasonable jury could credit his testimony that he was assaulted and reported the assaults to guards. *Cf. Scott v. Harris*, 550 U.S. 372, 378, 380 (2007) (holding that the plaintiff's version of events was "utterly discredited" by a videotape of the incident where there were no allegations that the video was doctored or altered). *Scott v. Harris* is typically applied in cases with video evidence, *see, e.g.*, *Pennington v. Terry*, 644 F. App'x 533, 540 (6th Cir. 2016); *Oliver v. Green*, 613 F. App'x 455, 457 (6th Cir. 2015), but we have applied *Scott* without video or medical-record evidence, *see, e.g.*, *Rodriguez v. City of Cleveland*, 439 F. App'x 433, 456 (6th Cir. 2011); *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009). It does not apply in this case because its application is limited to when "there are objective facts in the record, such as a video, showing that one party's account is simply beyond belief," *Gholston v. Wayne Cnty. Airport Auth.*, 574 F. App'x 632, 637 (6th Cir. 2014), and the record evidence does not rise to that level.

Accordingly, drawing all reasonable inferences in Roberts's favor, as we must at this stage of the proceedings, a reasonable jury could conclude that Roberts was assaulted by the other inmates and reported those assaults to Strange and other guards.

Turning to the objective prong, Roberts testified that he was assaulted by inmates as a result of smuggling tobacco into the jail, and that he reported the assault to Strange and others, and

requested that Carroll transfer him to a different pod for his safety. He was then assaulted by the same inmates twice more, each time reporting the assault to guards, but was not moved until three days after the third assault. Based on this evidence, a reasonable jury could conclude that there was a substantial risk of serious harm to Roberts if he remained in AD pod with the same inmates who had already attacked him. *See, e.g.*, *Richko v. Wayne County*, 819 F.3d 907, 916 (6th Cir. 2016) (finding that "being housed with and attacked by an inmate who had recently been arrested for violent assault and had a history of serious mental illness was sufficient to fulfill the objective component of this analysis"); *Williams v. McLemore*, 247 F. App'x 1, 9 (6th Cir. 2007) ("In the abstract, one prison inmate's threat to the health and safety of another inmate is 'sufficiently serious' to satisfy this requirement.").

As to the subjective prong, Carroll and Strange argue that they were not subjectively aware of the risk of harm to Roberts because they were not aware that Roberts was in possession of tobacco that other inmates wanted, and thus had no reason to suspect that the inmates would continue to harm Roberts. They also argue, and the magistrate judge found, that even if Carroll and Strange were aware that Roberts had reported an assault, they "could have reasonably discredited the risk of assault to [Roberts], as neither officer witnessed [Roberts] with any kind of injury, [Roberts] did not identify the individuals assaulting him, there were no identified witnesses to the alleged assaults, and no institutional records support that the assaults occurred." R. 60, PID 354. Drawing all reasonable inferences in favor of Roberts, however, a reasonable juror could conclude that Carroll and Strange were both subjectively aware after the first assault that Roberts had been assaulted by inmates and was requesting a transfer for his safety, as Roberts testified that he reported the assault to Strange directly when he had visible injuries, and Watkins testified that an inmate's report of an assault and request to be transferred would be routed to a shift lead or

classifications officer like Carroll. Although explaining a motive for a feared assault may help prison guards evaluate whether an assault is likely to occur, once an inmate has actually been assaulted, a reasonable jury could find that prison guards knew that the threat against him was real regardless of the attackers' motivations.

Carroll and Strange cite no caselaw requiring that an already assaulted inmate must explain the motive for the assault to guards to be entitled to protection. To be sure, had the officers investigated the incident and reasonably concluded that Roberts was not in danger because they could not determine a motive for any future assault, their argument that they were not deliberately indifferent would be stronger. But a reasonable jury could infer based on Roberts's testimony that he reported the assaults and Carroll and Strange did nothing in response. Thus, a reasonable jury could find that Carroll and Strange were subjectively aware of the substantial risk of harm based on Roberts's report of the prior assault, and that they failed to respond reasonably to that risk by taking no action, instead allowing him to remain in AD pod with the same inmates who had already assaulted him.

Carroll and Strange also argue, and the magistrate judge agreed, that their actions were not the proximate cause of the alleged assaults and that Roberts's bringing tobacco into the jail and declining to tell them about it means that he cannot show causation. We disagree. Proximate causation is an essential element of a § 1983 claim for damages. *Doe v. Sullivan County*, 956 F.2d 545, 550 (6th Cir. 1992). We have explained that to establish causation in the § 1983 context, a plaintiff "need only demonstrate a link between each defendant's misconduct and [the plaintiff's] injury." *Clark-Murphy v. Foreback*, 439 F.3d 280, 292-93 (6th Cir. 2006) (emphasis omitted). Thus, we have framed "the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983

plaintiff as a result of the defendant's conduct." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007). Further, "[p]roximate causation, or the lack of it, is generally a question of fact to be decided by a jury," *Toth v. Yoder Co.*, 749 F.2d 1190, 1196 (6th Cir. 1984), "[u]nless the evidence is such that a reasonable person could reach only one conclusion," *Pierce v. United States*, 718 F.2d 825, 829 (6th Cir. 1983). Here, Carroll and Strange cite no caselaw finding an absence of proximate causation as a matter of law under similar circumstances. Viewing the evidence in the light most favorable to Roberts, a reasonable jury could find that there was a link between the second and third assaults and Carroll and Strange's non-response to Roberts's reports of the assaults, and that it is foreseeable that failing to transfer Roberts or any of his attackers after Roberts was assaulted once (or twice) would result in subsequent attacks.

Finally, Strange and Carroll argue that Roberts's claim against them must fail because he suffered no more than de minimis injuries.[4] In making this argument, Strange and Carroll ask us to ignore Roberts's testimony that he took "kicks and blows to the ribs and [his] legs" in the May 15 assault, where he felt like the inmates were "trying to put [him] back in the wheelchair," R. 49-5, PID 190, and his testimony that his leg is still worse[5] to this day because of the assaults and he has "to hold the wall to sit down and use the bathroom," *id.* at PID 194. Indeed, they do not dispute that Roberts's testimony, if believed, constitutes more than de minimis injuries. Rather, they argue that no reasonable jury could credit his testimony because he waited over a week to file a grievance

---

[4] In a footnote, Carroll and Strange argue that Roberts forfeited this issue, and thus his entire claim against them, by failing to address it in his opening brief. Although he did not specifically discuss this issue, Roberts argued that the magistrate judge erred in granting summary judgment against him in part because she erroneously made credibility determinations, which is the reason he argues her de-minimis-injury determination is erroneous, and argued that his Fourteenth Amendment rights were indeed violated. We decline to find that Roberts forfeited his right to appeal the dismissal of this claim under these circumstances.

[5] Roberts had suffered a prior gunshot to his leg.

requesting medical attention, and NP Carter's notes from June 7 reflect minimal, if any, injuries, and she stated that she thought Roberts was malingering.

Drawing all reasonable inferences in Roberts's favor, a reasonably jury could find that he suffered more than de minimis injuries from the inmate assaults. As Roberts points out, NP Carter did not examine him until over three weeks after the second assault and prescribed him medication used to treat pain and swelling. Her notes also reflect that he had decreased range of motion in his back. Even if NP Carter's notes and testimony could rule out that Roberts suffered major injuries, a reasonable jury could find that he requested medical attention promptly and that the pain he suffered more than three weeks after the assault constitutes more than de minimis injuries. *Cf. Jarriett v. Wilson*, 162 F. App'x 394, 401 (6th Cir. 2005) (concluding that the plaintiff suffered only de minimis injuries where he suffered only "swelling, pain, and cramps, which were not serious enough to mention to medical staff" when he saw them the day of and two days after the incident). We therefore reverse the grant of summary judgment to Carroll and Strange based on their failure to respond to Roberts's reports of the assaults by other inmates.

Roberts also alleges deliberate indifference against Strange for his failure to intervene during the second assault. Roberts testified that the inmates assaulted him in his cell, and that during the assault, "Strange was in the tower, supposedly watching over the pod to keep us safe," R. 56-2, PID 239. However, there is no evidence that Strange, from his position in the tower, could or actually did see the inmates assaulting Roberts, or that he had time to intervene but failed to do so. *Cf. Richko*, 819 F.3d at 919-20 (affirming denial of summary judgment where the plaintiff presented evidence that loud sounds such as the banging, yelling, and pounding that were made during the assault could be heard from the duty station where the guard was located, and thus presented sufficient evidence that the guard "simply chose not to respond" despite hearing the

assault take place). Accordingly, Roberts has not presented a genuine dispute of material fact about whether Strange was deliberately indifferent by failing to intervene in the second assault.

**B.**

Roberts alleged that Liles violated his right to be free from excessive force. As a pretrial detainee, to prevail on this claim Roberts must show "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97. According to Roberts, Liles slammed a metal hatch on Roberts's arm and held it there for fifteen to twenty seconds after Roberts reached his arm through the flap to retrieve a food tray, causing injuries that still persist to this day. Roberts had received permission to grab the food tray and was not disobeying any contrary commands. Liles does not dispute that this type of gratuitous violence would violate Roberts's Fourteenth Amendment right to be free from excessive force. *See Coley v. Lucas County*, 799 F.3d 530, 539 (6th Cir. 2015) (explaining that "where an arrestee poses no threat to others and is not trying to escape, an 'unprovoked and unnecessary blow' violates the" right to be free from excessive force (quoting *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988))).

Rather, Liles argues, and the magistrate judge agreed, that Roberts's version of events is blatantly contradicted by the record because Liles testified that no such incident occurred, there are no records of the event, and Roberts did not seek medical treatment for his injuries. Again, Liles and the magistrate judge misconstrue how broadly the rule from *Scott v. Harris* should be applied. In that case, there was a videotape of the incident and no suggestion that the videotape did not capture the reality of the events at issue. *Scott*, 550 U.S. at 378. Under those circumstances, the Court held that it was not required to accept the plaintiff's version of events that was contradicted by the videotape. *Id.* at 380. Here, in contrast, although there is no documentary or video evidence corroborating Roberts's testimony, there is also no evidence that blatantly

contradicts it. Because Roberts's testimony is itself evidence that the incident occurred, his testimony creates a genuine dispute of material fact that Liles assaulted him without provocation or penological justification in violation of the Fourteenth Amendment. *See Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (explaining that pain inflicted "totally without penological justification" can violate the Eighth Amendment (internal quotation marks omitted)).

Apart from whether the incident occurred, Liles also argues that he is entitled to summary judgment because the lack of medical records shows that Roberts did not suffer an actionable injury. We disagree. In the excessive-force context, the focus is on the extent of the force used rather than the extent of the injuries, although the two are at least imperfectly correlated. *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (per curiam). Thus, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.* at 38.

Roberts testified that he was still experiencing pain from the incident, including a sharp pain when he moves too fast or tries to lift something too heavy. Although he never sought medical treatment for these injuries, the absence of medical reports does not prove that Liles did not use excessive force or cause an actionable injury. As Roberts argues on appeal, given the delay in responding to his complaints about the inmate assaults and the fact that he had been prescribed pain medication two days prior, a reasonable jury could infer that Roberts declined to seek medical treatment because he did not believe it would result in further treatment, rather than because the alleged assault never occurred. Further, although the extent of the injuries is a consideration in determining whether the amount of force used was objectively reasonable, *Kingsley*, 576 U.S. at 397, here, drawing all reasonable inferences in Roberts's favor, there was no reason for any force to be used at all. Thus, slamming a metal hatch on an inmate's arm for fifteen to twenty seconds,

resulting in pain that persists over two years later, is objectively unreasonable and sufficiently injurious under these circumstances, *see id.* (listing remaining non-exclusive list of factors to determine whether the use of force was objectively reasonable, including "the relationship between the need for the use of force and the amount of force used; . . . any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting"); *Coley*, 799 F.3d at 538-39 (explaining that the inquiry "focuses on the force itself rather than the injury," citing cases holding that "a spontaneous assault by a prison guard on an inmate is grounds for an Eighth Amendment excessive force claim," and holding that an allegation that the plaintiff was shoved and struck his head on the wall sufficiently alleged injury).

Accordingly, we reverse the grant of summary judgment to Liles on the excessive-force claim.

## C.

We now turn to Roberts's claim against the County. A county "may be held liable under § 1983 for constitutional violations committed by [its] employees if the violations result from [county] practices or policies." *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Roberts first argues that the magistrate judge improperly granted summary judgment because he presented sufficient evidence that the County had a custom of tolerating its employees' violations of constitutional rights. He does not argue that the County's official policies or procedures are unconstitutional.

Because Roberts relies on "a custom of *inaction* towards constitutional violations," he must "show (1) a 'clear and persistent pattern' of misconduct, (2) notice or constructive notice on the part of the municipality, (3) the defendant's tacit approval of the misconduct, and (4) a direct

causal link to the violations." *Nouri v. County of Oakland*, 615 F. App'x 291, 296 (6th Cir. 2015) (quoting *Powers*, 501 F.3d at 607). As discussed above, Roberts has presented a genuine dispute of material fact that his constitutional rights were violated due to the County's employees not transferring or otherwise responding to protect him after an assault and to one of its employees' use of excessive force.

To support his argument that the County had a custom of ignoring threats to inmate safety, Roberts argues that he presented evidence of five incidents of guards ignoring threats to inmates and multiple incidents of guards abusing inmates. Aside from the incidents involving the operative facts in this case, Roberts presented the following evidence. First, Roberts points to inmate Blake Cretacci's testimony that Cretacci was assaulted by three other inmates, that officers not involved in this case separated the assailants and interrogated them and Cretacci, and that Cretacci was then assaulted by the same inmates after breakfast about a half hour later. Cretacci also testified about a riot in the jail and described guards beating and using mace on inmates in the aftermath of the riot. Second, Roberts points to an incident report involving other officers and an inmate, Jeremiah Allsopp. According to the incident report, Allsopp told officers that he needed to be moved or would have an altercation with his cellmate, officers conferred and determined that "there really was no problem" but informed Allsopp that they would talk to a classifications officer, and when Allsopp then started cussing at one of the officers, the officer "brought him to the ground and handcuffed him." R. 56-6, PID 246. Finally, Roberts points to another lawsuit by an inmate named Danny Jacobs, who alleged that he was assaulted by a guard not involved in this case and accepted an offer of judgment from Coffee County and the guard in the amount of $20,001.

We are not persuaded that this evidence suffices to establish a "clear and persistent pattern of violating federal rights" that the County had notice of and tacitly approved. *Powers*, 501 F.3d

at 607.  Roberts's own experience is insufficient on its own to establish liability against the County. *Nouri*, 615 F. App'x at 296; *see also Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005) ("[W]ithout showing more than officer Abernathy's potentially excessive use of force in this particular case, Thomas cannot survive summary judgment.").  Although Cretacci's testimony is somewhat similar to Roberts's allegations, in Cretacci's case, summary judgment was granted in favor of the defendants because the district court found no underlying constitutional violation. *Cretacci v. Call*, Case No. 4:16-cv-00097-CHS (E.D. Tenn. May 20, 2020), ECF No. 74, PID 1322-25.  Further, there is very little information in the record about the Allsopp and Jacobs incidents.  In any event, those incidents occurred after the events in this case, so the County could not have had notice of these events, and there is no evidence in the record about how the County responded to any of these incidents.  Finally, as the magistrate judge found, the incidents relied on by Roberts are too few and dissimilar to establish "a clear and persistent pattern."  *See Thomas*, 398 F.3d at 430-34 (affirming summary judgment in favor of the municipality because the plaintiff "failed to show separate instances" of similar rights violations, and rejecting expert's reliance on other complaints of excessive force as establishing a custom because the expert failed to present evidence about whether those complaints were serious or frivolous, and failed to present sufficient data regarding how the excessive-force complaints in that city compared to other similarly sized cities).

For the same reasons, Roberts has not presented sufficient evidence on a failure-to-supervise theory, for which he again relies on the argument that the County is deliberately indifferent for "fail[ing] to act in response to repeated complaints of constitutional violations by its officers."  *Winkler v. Madison County*, 893 F.3d 877, 903 (6th Cir. 2018) (internal quotation marks omitted).  In addition to the above evidence, Roberts relies on Strange's June 2017

termination notice.[6] The notice states that Strange was being terminated for inappropriate contact with female inmates after already being subject to disciplinary action for attendance issues, sleeping on shift, insubordination, and failure to perform duties. Roberts conclusorily argues that "[e]mploying a guard like this is further evidence of Coffee County's failure to supervise its guards." Appellant's Br. at 26. However, because Strange's discipline was in response to incidents that are dissimilar from Strange's alleged constitutional violations here, and the only evidence in the record shows that the County disciplined Strange for each transgression, the termination notice is not helpful to Roberts in establishing that the County inadequately supervised Strange or that its inadequate supervision caused the constitutional violations here. *See Winkler*, 893 F.3d at 903 (explaining that a plaintiff cannot succeed on the failure-to-supervise theory asserted by Roberts where a plaintiff does not present evidence of previous similar instances of constitutional violations); *Harvey v. Campbell County*, 453 F. App'x 557, 562 (6th Cir. 2011) (listing elements of a failure-to-train-or-supervise claim (citing *Plinton v. County of Summit*, 540 F.3d 459, 464 (6th Cir. 2008))).

### III.

For the reasons set out above, we AFFIRM the grant of summary judgment to Coffee County, AFFIRM the grant of summary judgment to Strange based on his failure to intervene in the second assault but REVERSE the grant of summary judgment to Strange based on his failure to respond to the reports of assaults, REVERSE the grant of summary judgment to Carroll and Liles, and REMAND for further proceedings consistent with this opinion.

---

[6] Roberts also notes that the County failed to produce records regarding the assaults other than the one record that shows that he had an altercation and was being moved. He does not explain how this supports his theories of liability against the County, nor did he make more than a passing reference to this issue in his briefing in the district court.